**Ronald Eugene RICKMAN, Petitioner–
Appellee/Cross–Appellant,**

v.

**Ricky BELL, Warden, Respondent–
Appellant/Cross–Appellant.**

**Nos. 94–5721, 94–6232 and 94–6538.**

United States Court of Appeals,
Sixth Circuit.

Argued April 24, 1997.

Decided Dec. 2, 1997.

---

Kathy Morante, Asst. Attorney Gen. (argued and briefed), C. Mark Fowler, Asst. Attorney Gen., Glenn R. Pruden (briefed), Brent Horst, Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Respondent–Appellant/Cross–Appellee in No. 94–5721.

Gordon W. Smith, Asst. Attorney Gen. (briefed), Kathy Morante, Asst. Attorney Gen. (argued), Glenn R. Pruden (briefed), Charles W. Burson, Attorney General, Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Respondent–Appellant/Cross–Appellee in No. 94–6232.

Gordon W. Smith, Asst. Attorney Gen. (briefed), Glenn R. Pruden (briefed), Kathy M. Principe (argued and briefed), Office of the Attorney General, Criminal Justice Division, Nashville, TN, for Respondent–Appellant/Cross–Appellee in No. 94–6538.

Henry A. Martin, Fed. Public Defender (briefed), Paul R. Bottei (argued· and briefed), Federal Public .Defender's Office, Nashville, TN, William P. Redick, Jr. (briefed), Whites Creek, TN, for Petitioner–Appellee/Cross–Appellant.

Before: KEITH, RYAN, and SUHRHEINRICH, Circuit Judges.

**1152**

RYAN, J., delivered the opinion of the court, in which KEITH, J., joined. SUHRHEINRICH, J. (pp. 1160–1167), delivered a separate dissenting opinion.

## OPINION

RYAN, Circuit Judge.

Ricky Bell, the warden of the Tennessee Riverbend Maximum Security Institution and the respondent in this proceeding, appeals from the district court's judgment granting a writ of *habeas corpus* to petitioner Ronald Eugene Rickman pursuant to 28 U.S.C. § 2254. Rickman has filed a cross-appeal from the district court's denial of several of his constitutional claims.

Although both parties advance numerous issues, we find only one necessary to our resolution of this appeal. Concluding that the district court correctly found Rickman to have been unconstitutionally denied effective assistance of counsel under the Sixth Amendment, we will affirm.

### I.

#### A.

In February 1978, William E. Groseclose was convicted of murder in the first degree in connection with the killing of his wife, Deborah Lee Groseclose, on June 29, 1977. The prosecution's theory was that Groseclose hired petitioner Rickman and another man, Phillip Michael Britt, to kill Deborah. Groseclose was alleged to have contacted Barton Wayne Mount, a naval recruit Groseclose met while Groseclose was employed in the Navy Recruiting Service, in an effort to employ someone to murder Mrs. Groseclose. *State v. Groseclose,* 615 S.W.2d 142, 144 (Tenn.1981). Mount referred Groseclose to Britt, who, in turn, contacted Rickman, Britt's former brother-in-law. Rickman agreed to commit the murder in cooperation with Britt, a fact of which Mount was aware. Groseclose agreed to pay a particular price in which Rickman, Britt, and Mount would all share.

The Tennessee Supreme Court in its joint opinion affirming both Groseclose's and Rickman's convictions described the murder as "one of the most atrocious and inhuman conceivable." *Id.* at 145. According to the evidence presented by the State at trial, Rickman, acting pursuant to the conspiracy, accosted Deborah the day before the murder "to frighten her to the point that she would report ... the incident to the police," in an attempt to later divert suspicion for the planned murder from her husband. *Id.* The next morning, Groseclose left his house with the couple's infant son, leaving the back door unlocked. Rickman and Britt then entered the house; each raped Deborah Groseclose, and then told her "there was a 'contract' on her life." *Id.*

After listening to Deborah "plead" for her life by offering money to her assailants, Rickman "proceeded to strangle Mrs. Groseclose into unconsciousness" and then, because he detected a pulse, to stab her three or four times in the back. *Id.* Rickman and Britt placed Deborah in the trunk of her car, apparently believing her to be dead, and "drove the vehicle to a parking lot adjacent to the main Memphis Public Library." *Id.* Despite hearing Deborah's "cries for help from the trunk," *id.,* Rickman left her there, abandoning the car. Deborah's body was discovered five days later, and the medical testimony at trial suggested that she would not have died from her injuries, but died instead as a result of the excessive heat in her car trunk.

During the investigation that followed, police were led to Rickman and Mount through information given by Rickman's roommate. Rickman and Britt both gave inculpatory statements to the police, as did Mount. Mount, in fact, testified for the State at the trial of Rickman, Britt, and Groseclose, and later pleaded guilty to second-degree murder.

#### B.

Jury selection began for the joint trial on February 13, 1978, and was completed on February 17. The trial began on February 18 and was concluded on February 28. The sentencing hearing was held between March 1 and March 3.

The State presented 39 witnesses during the guilt phase of the trial. None of the defendants testified during the guilt phase. All three defendants were convicted of murder in the first degree and both Rickman and Groseclose were sentenced to death. Britt received a sentence of life imprisonment.

The Tennessee Supreme Court affirmed Rickman's conviction in 1981, *Groseclose*, 615 S.W.2d 142, and the U.S. Supreme Court denied his petition for writ of *certiorari*, *Rickman v. Tennessee*, 454 U.S. 882, 102 S.Ct. 367, 70 L.Ed.2d 193 (1981). Rickman then filed a petition for post-conviction relief in January 1982, arguing, *inter alia*, that he had received constitutionally ineffective assistance of counsel. The trial court denied the petition in December 1982, after holding an evidentiary hearing. The Court of Criminal Appeals affirmed the denial in February 1984. *Groseclose v. Tennessee*, No. 9 (Tenn. Crim.App. Feb. 16, 1984). The Supreme Court of Tennessee denied the subsequent application for permission to appeal, and the U.S. Supreme Court denied the petition for writ of *certiorari*. *Rickman v. Tennessee*, 469 U.S. 963, 105 S.Ct. 363, 83 L.Ed.2d 299 (1984).

Rickman filed the petition for writ of *habeas corpus* at issue here on March 5, 1985, amending it in July 1990, November 1992, and January 1994. In 1994, Rickman filed a motion for partial summary judgment, and the State filed a cross-motion for partial summary judgment in response. The district court granted Rickman's motion in part, and ordered a new sentencing proceeding based on perceived flaws in the jury instructions on capital punishment. *Rickman v. Dutton*, 854 F.Supp. 1305 (M.D.Tenn.1994). The State filed a notice of appeal following the district court's determination that there was no just reason to delay entry of its partial judgment, pursuant to Fed.R.Civ.P. 54(b).

The district court later addressed the remaining issues in Rickman's *habeas* petition, first holding an evidentiary hearing. The court held Rickman's conviction to have been unconstitutional for two reasons: the constitutionally ineffective assistance of counsel and the cumulative effect of other errors resulting in a denial of due process. *Rick-man v. Dutton*, 864 F.Supp. 686 (M.D.Tenn. 1994). The district court simultaneously rejected, however, several of Rickman's arguments.

The State again filed a timely appeal, and amended its notice of appeal following the district court's partial grant of Rickman's motion to amend the judgment. Rickman filed a cross-appeal following the district court's grant of a certificate of probable cause.

## II.

Although we review *de novo* the district court's disposition of a petition for writ of *habeas corpus*, we review the district court's factual findings only for clear error. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997). Further, federal courts must defer to state court factual findings, according to them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. *Id.* However, "[t]he presumption only applies to basic, primary facts, and not to mixed questions of law and fact," which receive *de novo* review. *Id.*

A claim of ineffective assistance of counsel presents a mixed question of law and fact, for which both the state-court and district-court determinations are subject to *de novo* review by this court. *See Sims v. Livesay*, 970 F.2d 1575, 1579 (6th Cir.1992); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989).

[I]n a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t.]" Rather, ... it is a mixed question of law and fact. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and although district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the

performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact.

*Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984) (citations omitted); *accord McQueen,* 99 F.3d at 1310–11.

In setting forth this standard of review, we note the parties' disagreement as to the effect of the recent amendments to 28 U.S.C. § 2254 contained in section 104 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214 (1996). Although the AEDPA became effective on April 24, 1996, and although it mandates significant changes to the federal courts' treatment of both factual and legal issues in the *habeas* setting, the Supreme Court's recent decision in *Lindh v. Murphy,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), instructs that those changes do not apply to this case, or to any case pending at the time of the AEDPA's enactment; instead, those changes "generally apply only to cases filed after the Act became effective." *Id.* at ——, 117 S.Ct. at 2068. Because Rickman filed his *habeas* petition in 1985, we are left to apply section 2254(d) as it existed prior to enactment of the AEDPA. *See id.*

### III.

■ Rickman was represented at trial by Robert I. Livingston, court-appointed counsel. Although Rickman's *habeas* petition challenges Livingston's performance during both the guilt and the penalty phases of his trial, the district court below addressed only the guilt phase, finding it unnecessary to address the penalty phase. It concluded that Livingston had rendered ineffective assistance of counsel to Rickman, as evidenced by a variety of deficiencies, including Livingston's failure to investigate the case or to prepare for trial; his failure to consider the possibility of an insanity defense for Rickman; and the overwhelming hostility he evidenced toward his client throughout the proceedings. The district court nonetheless concluded that Rickman failed to show that Livingston's deficient performance resulted in any prejudice, both because the evidence against Rickman was so overwhelming and because Rickman was unable to show that any line of defense, including an insanity defense, would have benefitted him. This absence of actual prejudice, however, was not fatal to Rickman's claim, according to the district court, because Livingston's hostility and inadequacy effectively robbed Rickman of *any* representation whatsoever, thus eliminating the need for a showing of actual prejudice.

The district court's reasoning relied on its interpretation of *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the companion case to the bellwether ineffective-assistance case, *Strickland v. Washington.* In *Strickland,* the Court for the first time "consider[ed] the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction or death sentence to be set aside because counsel's assistance at the trial or sentencing was ineffective." 466 U.S. at 671, 104 S.Ct. at 2056. The Court concluded that, whether the focus is the trial or the sentencing, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064.

The *Strickland* Court announced a two-part test to be applied in the usual case: a showing of seriously deficient performance coupled with a showing "that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. The Court established an objective test for the first prong: "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness," as judged simply by "prevailing professional norms." *Id.* at 687–88, 104 S.Ct. at 2064; *accord Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). Indicia of objective unreasonableness include the violation of "certain basic duties" inherent in the representation of a criminal defendant, among them a "duty of loyalty" to the client, from which derive "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defen-

dant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. In addition, "[c]ounsel ... has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* In assessing deficient performance, the Court cautioned, reviewing courts must take care to avoid "second-guess[ing]" strategic decisions that failed to bear fruit. *Id.* at 689, 104 S.Ct. at 2065.

Turning to the second, "prejudice" prong of its test, the *Strickland* Court held that a defendant must show more than "that the errors had some conceivable effect on the outcome of the proceeding"; instead, the defendant must be able to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693–94, 104 S.Ct. at 2067–68. No matter how deficient an attorney's performance, the *Strickland* Court reasoned, in the absence of a showing of prejudice, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable," and a defendant is, thus, not entitled to a new trial or sentencing. *Id.* at 687, 104 S.Ct. at 2064.

But following immediately on the heels of its articulation of the prejudice requirement, the *Strickland* Court provided for an exception in rare circumstances. In some instances, a court must simply presume that prejudice resulted:

> In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice.... [P]rejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests.

*Id.* at 692, 104 S.Ct. at 2067 (citations omitted).

In *Cronic,* the Court elaborated on the presumed-prejudice exception to which it alluded in *Strickland,* recognizing that "[t]here are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046. The fundamental question, the *Cronic* Court suggested, is whether the trial "process [has lost] its character as a confrontation between adversaries"; if so, then "the constitutional guarantee is violated." *Id.* at 656–57, 104 S.Ct. at 2045–46. And then, it is not necessary to demonstrate actual prejudice.

This circumstance may arise in several different contexts. "Most obvious," the Court noted, "is the complete [ (*i.e.,* actual) ] denial of counsel." *Id.* at 659, 104 S.Ct. at 2047. That, of course, is not at issue here. But the *Cronic* Court also noted the possibility of a *constructive* denial of counsel, when, although counsel is present, "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided." *Id.* at 654 n. 11, 104 S.Ct. at 2044 n. 11. Equally important, the Court held, is the case in which "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," because "then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659, 104 S.Ct. at 2047. The Court concluded with a rather imprecise dictate: that the inquiry into *actual* prejudice may be dispensed with "only when surrounding circumstances justify a presumption of ineffectiveness." *Id.* at 662, 104 S.Ct. at 2048.

The "narrow" exception carved out by *Cronic*, then, provides a reviewing court with some difficulty in application. *See Childress v. Johnson*, 103 F.3d 1221, 1229 (5th Cir. 1997). And it is the State's principal argument on appeal that the district court erred in applying the *Cronic* exception. The circumstances here, it argues, were not of sufficient magnitude to invoke *Cronic*. Here, it contends, there simply was no *bona fide* defense available, and the Sixth Amendment does not require a lawyer to invent one. The State characterizes the hostility and disgust Livingston exhibited toward his own client, the particulars of which we will fully describe below, concomitant with his unnecessarily eliciting testimony from witnesses that would necessarily horrify the jury, as a legitimate strategy, albeit one that, predictably, was doomed to failure. The State then concludes that, it being inappropriate to presume prejudice, the writ of *habeas corpus* should not have issued because there was no showing of actual prejudice; that is, there is no reasonable probability that but for Livingston's errors, Rickman would have been found not guilty.

■ The State claims, and the district court found, that Rickman is unable to show actual prejudice resulting from Livingston's representation as that concept is understood in the second prong of the *Strickland* analysis. Rickman argues that if Livingston had investigated and presented a defense of lack of *mens rea*, there is a reasonable likelihood that Rickman would not have been convicted of first-degree murder, and contends that such a defense was viable because the physical evidence and even his confession were consistent with the position that he merely sought to incapacitate Deborah Groseclose, not to kill her. The premise underlying this argument is simply incorrect. As the State points out, Rickman's statement and the physical evidence showed that Rickman contracted with Groseclose to kill Deborah, and that he intentionally killed her. The fact that he was ineffective in his initial attempts to kill her simply does not amount to a lack of intent to kill. And as the State also observes, even Rickman's own expert at the *habeas* evidentiary hearing "candidly acknowledged that Rickman understood the wrongfulness of his actions, [and] could conform his behavior to the requirements of the law." We agree, then, that the district court correctly concluded that Rickman has not shown prejudice as understood in *Strickland.*

Thus, only if Livingston's performance was so egregious as to amount to the virtual or constructive denial of the assistance of counsel, and thus implicate the *Cronic presumption* of prejudice, can Rickman succeed. And this, we conclude, was the case. Livingston's behavior can be termed nothing short of shocking and professionally outrageous. We are aware, of course, that the Tennessee trial court rejected Rickman's ineffective-assistance claim. That court, however, focused only on Livingston's more routine failures—his failure to investigate the case, and his failure to communicate with his client—which, while certainly indicative of a seriously deficient performance, were not so inept as to give rise to a presumption of prejudice. The only mention of Livingston's abusive treatment of his own client is rather jejune, however, with no consideration of the particulars of Livingston's behavior:

> The Court does not find that Mr. Livingston's trial techniques or strategic procedures are shocking as submitted by the petitioner. From the outset, Mr. Livingston's strategy was to save the life of the petitioner. The Court has had the opportunity to observe Mr. Livingston for a number of years as an adversary counsel and from the trial bench and always found him to be a worthy and resourceful lawyer.

In affirming the trial court's decision, the Tennessee Court of Criminal Appeals was less reluctant to confront the egregiousness of Livingston's behavior, deeming it a "serious issue." It apparently failed to recognize, however, that Livingston's behavior was exhibited both during the guilt phase as well as during the sentencing phase; this failure led it to be content to treat Livingston's actions simply as sentencing strategy gone awry:

> In the post-conviction hearing, [Livingston] testified that after the state's evidence was completed in the guilt phase, there was no doubt that Rickman and the others were going to be sentenced to

death. Based on this judgment, the lawyer decided that the only thing he could do in an effort to save Rickman was to show his sordid past. The lawyer testified that there was a last ditch effort to persuade the jury that Rickman was abnormal, that he had had a more difficult childhood and history than the normal person in the hope that this would gain sympathy with the jury and avoid a sentence of death.

This approach by the lawyer may very well be described as desperate, with little hope of success. However, when viewed in the light of the overwhelming evidence of guilt of a murder described as "one of the most atrocious and inhuman conceivable," what in hindsight might appear desperate and unlikely of success becomes less startling in the face of the hopeless cause with which the lawyer was faced.

But our thorough review of the record and consideration of the circumstances of the overwhelming evidence of Rickman's guilt leave us, like the district court below, appalled by Livingston's performance. As we shall describe, Livingston combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions. The effect of all this was to provide Rickman not with a defense counsel, but with a second prosecutor. And while the State makes a claim that Livingston was pursuing a strategy of painting a picture of his client that would make the jury find him too pitiable to convict or sentence to death, this simply stretches imagination past the point of credulity. Livingston succeeded in creating a loathsome image for Rickman—one that would make a juror feel compelled to rid the world of him.

Livingston's abandonment of his client's interests commenced almost immediately upon their first meeting:

Livingston[ ] testified that after being assigned Rickman's case, he interviewed Rickman and asked him if a statement he had given to the authorities was "true." Livingston then stated that, after being told by Rickman that the statement was true, "From that point on, my defense was to persuade the District Attorney of Shelby County to allow Ronald Rickman to

enter a plea of guilty and accept the life sentence...." Livingston assumed that there was no defense to the charge of first-degree murder and failed to conduct any investigation.

Livingston acknowledged that he only presented a defense at the sentencing phase of trial. With respect to the guilt phase of trial, he asserted, "There was no defense." Accordingly, Livingston did not interview any witnesses, conduct any legal research, or obtain and review any records, including those regarding Rickman's employment, education, mental health, social services contacts, military service, or prison experience. By Livingston's account, he spent a total of sixteen hours preparing for Rickman's trial. Livingston's preparation consisted solely of interviews he conducted with Rickman.

*Rickman,* 864 F.Supp. at 699–700 (footnote and citations omitted).

Livingston was not content with mere nonfeasance, however. In addition to failing to construct any rational defense theory, he embarked on a course of attempting " 'to persuade the jury that his client, although judged legally competent to stand trial, [was], in fact, abnormal and should not be judged as a normal person.' " *Id.* at 700. According to Livingston, he " 'was trying to show the jury that we had a sick boy on trial, a subnormal, abnormal human being on trial.... That was my whole object of the whole defense, was [to] try to convince the jury that we had a sick man on trial.' " *Id.* It was what Livingston did in order to effect this purpose that is so stunning, and that correctly led the district court to conclude that Rickman was "[f]unctionally ... totally denied counsel even though his attorney [was] physically present during the proceedings." *Id.* at 701. In our view, Rickman would have been better off to have been merely denied counsel; as it was, he had to endure attacks from his own attorney that equaled or exceeded those of the prosecution.

Had Livingston, despite eschewing an insanity defense, for which apparently there was no evidence, sought nevertheless to show, *in the evidence,* that Rickman was a "sick boy" we might characterize the effort

as a weak tactic unlikely to succeed, but at least a tactic. But what he did instead was to convey to the jurors an unmistakable personal antagonism toward Rickman, characterized both by attacks on Rickman and by repeatedly eliciting information detrimental to Rickman's interests. Examples of the latter may be found in Livingston's cross-examination of Mount, the go-between for Rickman and Groseclose, during the guilt phase of the trial, as summarized by the district court:

> Livingston suggested to Mount that Mount had carefully planned out the crime with Rickman and the other co-defendants "to the nth degree," listing the name of each co-defendant separately for greater emphasis. Livingston reinforced the notion of planning despite proof which suggested that the defendants entered the victim's residence without a lethal weapon and may have lacked a coherent plan at that point as to how she was to be killed.

*Id.* at 702. Likewise, Livingston questioned several different witnesses concerning a hand grenade detonator and a motorcycle jacket that allegedly belonged to Rickman. Rather than attempting to disassociate Rickman from these objects, Livingston's questioning was aimed at linking Rickman to them and simultaneously demonstrating contempt for their owner. But he went even further, presenting at least one witness to describe Rickman's threats to commit unrelated crimes. Livingston questioned Rickman's girlfriend as follows:

Q. Did Ron ever tell you he was going to blow somebody up with it? [referring to the grenade detonator]

A. He was always threatening to bomb the 7–Eleven stores ... but I didn't believe him.

Q. What other crimes did he tell you he was going to commit that you didn't believe?

A. Is that really important?

Q. Yes, ma'am.

A. He was always talking about catching some buildings on fire if he was mad at somebody. . . . One time he threatened to kill a person over me.

*Id.* at 702–03. Of another witness, he asked, referring to the motorcycle jacket, "Do you think average red-blooded American boys wear something like this ...?" *Id.* at 703. Then, with regard to the hand grenade detonator, he asked the same witness, "Do you think a normal red-blooded American boy would walk around with a live grenade? What do you think about that?" *Id.*

Livingston's attacks on Rickman took the form of portraying him as crazed and dangerous. He repeatedly asked Mount, for example, whether Mount thought Rickman was "nuts," and ridiculed Mount's demurrer by saying, "You wouldn't know a psychiatric case if you saw one, would you?" *Id.* at 702. Likewise, he asked Rickman's girlfriend whether Rickman 'act[ed] like a bull ... I mean, violent. . . ." *Id.* She responded, "When he was mad, yes." *Id.* When another witness, a neighbor of Rickman's and a member of the Marine Corps, testified that he considered Rickman to be a gentleman, Livingston ridiculed him as well, saying: "[Nineteen] years in the Marines and you would think that a man that looked like that was a gentleman?" *Id.* at 703.

The district court viewed an exchange between Livingston and two witnesses who had seen Rickman in Deborah Groseclose's car as best illustrating Livingston's demonstrated contempt for his client. Livingston questioned the first witness as follows:

Q. Did he appear to be intoxicated?

A. I don't think so.

Q. Did he appear to be under the influence of any type of narcotic drug?

A. I really don't know.

Q. What about his eyes? Did he kind of have a wild, glassy look in his eyes?

A. I didn't look at his eyes.

Q. You just looked at that grin on his face.

A. Well, he just turned his head and smiled. I didn't think anything of it. . . .

Q. Normal looking fellow, wasn't he?

A. I guess so.

Q. ... Yeah. You wouldn't call somebody that looked like this a normal, average, American looking boy, would

you? [demonstrating Rickman's mug shot]

A. In this day and time, yes.

Q. ... Thank God, I'm abnormal.

*Id.*

The second witness was questioned in a similar vein:

Q. You haven't been out on the street today then, have you? Woods is full of them, didn't you know that? Guys that look like this. Long hair. Long beard.. Wild eyed. You know they're out there, don't you? I know they're out there.

A. Right.

Q. Grinning. Like they just got out of somebody's insane asylum. You know what I'm talking about, don't you?

A. I know what you're talking about.

*Id.*

Perhaps the most jarring evidence of Livingston's patent hostility toward Rickman may be found in a soliloquy he pronounced during the sentencing proceeding, complete with an apology to the prosecutors for the crime:

I know this young woman was put in the trunk of that car. That's no secret. I know that. And I'm not happy about it. No, sir. I'm not happy. I'm ashamed. I'm ashamed that we live in such a world.... I'm ashamed that this crime has been committed in our community. And I want the family of Debra [sic] Groseclose to know that. That I'm ashamed. I'm ashamed that this young woman died in this oven. Mr. Miller, I'm ashamed. I'm ashamed, Mr. Stanton. I don't condone murder. I know criminal defense lawyers suffer from what is called guilt by association. When I go to church Sunday, they are going to waylay me out at the Bellevue Baptist Church

. . . .

. . . .

... [T]hat wild man [Rickman] over there with the gloves on—look at him. He's wild as a March hare, right now. He may take off after me in a minute. I don't know. He's crazy. I know he's crazy. Because if

he's normal I can only say, thank you, God, I'm abnormal, an [sic] you are abnormal.

*Id.* at 704 n. 9.

While our research reveals no cases in which a defense attorney behaved with this degree of hostility toward his client, it is quite clear that Livingston's performance dispenses with the necessity of a separate showing of prejudice; it is, in this case, patently inherent. Courts have consistently treated similar behavior as an abandonment of the duty of loyalty, or as a conflict of interest. *See United States v. Swanson,* 943 F.2d 1070, 1074–75 (9th Cir.1991). And courts have rightly viewed the equivalent of what Livingston did in this case to be worse than no representation at all:

[A]n attorney who is burdened by a conflict between his client's interests *and his own sympathies* to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition.

*Osborn v. Shillinger,* 861 F.2d 612, 629 (10th Cir.1988) (emphasis added); *see Don v. Nix,* 886 F.2d 203, 207 (8th Cir.1989); *cf. Houchin v. Zavaras,* 107 F.3d 1465, 1471 (10th Cir. 1997).

We find it simply incredible that the most damaging images of Rickman came from his own attorney.. Livingston was not confronted with witnesses eager to label Rickman as "nuts" or "just ... out of somebody's insane asylum"; he was not battling a prosecutor attempting to make irrelevant references to the hand grenade and the motorcycle jacket; he did not face an improper appeal to convict because of community sentiment in his opponent's closing. All of these outrageous tactics were introduced by Livingston himself, Rickman's own attorney. Livingston succeeded in presenting a terrifying image of Rickman, and thereby aligned himself with the prosecution against his own client.

Livingston's behavior cannot be characterized as legitimate trial strategy; no rational individual could think that painting a picture of one's client even more frightening than the prosecution could paint, would do anything other than doom the client. It is significant, too, that Livingston's appalling tactics were

employed during both the guilt and the sentencing phases. If, as the state appellate court believed, Livingston began his abuse of Rickman only at sentencing, it might be more conceivable that he was just undertaking a desperate and poorly executed strategy. As it was, however, Livingston tried to convince the jury that Rickman was "subnormal," violent, and with criminal propensities even as they were assessing whether he had in fact committed the crime. He went so far as to express personal sympathy for the prosecution and shame for representing Rickman.

If Livingston had been attempting to characterize Rickman as a hapless loser, or as someone who had suffered hard knocks through life, he might arguably have been pursuing a legitimate strategy. But his own testimony makes clear that Livingston had no such aim in mind: he simply wished to portray his client as vicious and abnormal. This is simply not a legitimate defense. Further, it is a portrayal that could only have encouraged the jury to put aside any doubts and convict speedily. The effect Livingston created was not one of pity for a pathetic Rickman, but one of hostility toward the hated and violent freak. Thus, while there may be a gray area where an attorney simply is unsuccessful at depicting his client in a sympathetic light, this case plainly falls way outside those boundaries. And it is impossible to read Livingston's statements and think that this was simply an inadvertent accident, a strategy gone awry. We obviously cannot read Livingston's mind, but his performance was so outrageous that it is not necessary for us to decide whether we can impute actual bad faith to him. If the effect he created was unintentional, it matters not to Rickman, who has been convicted and sentenced to death; it was just as fatal.

We have approached this case with great caution, conscious of the important limitations of our role as a federal court reviewing in *habeas* the conclusions of the Supreme Court of the sovereign state of Tennessee—limitations we deeply respect. We recognize, too, the import of a decision that mandates another trial for an individual concerning whom there is little question as to his guilt of a killing committed 20 years ago. But we are constrained to observe that what the Tennessee judiciary permitted to occur here was nothing less than the evisceration of the right-to-counsel that is guaranteed by the Sixth Amendment and as much a travesty for our entire judicial system as it is for Rickman individually. The display of Rickman's trial, if allowed to stand, would simply mock fundamental constitutional guarantees of "vital importance." *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063. The Court's recognition that " 'the right to counsel is the right to the *effective* assistance of counsel,' " *id.* at 686, 104 S.Ct. at 2063 (emphasis added) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970)), would be devoid of meaning were counsel like Livingston deemed effective.

## IV.

We conclude that Rickman was effectively deprived of counsel, in violation of the Sixth Amendment. Accordingly, we **AFFIRM.**

SUHRHEINRICH, Circuit Judge, dissenting.

In general, a defendant asserting an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and also that this deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2422, 138 L.Ed.2d 185 (1997). To show prejudice, the defendant must demonstrate that there is a reasonable probability that, absent counsel's unprofessional errors, the results of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* The majority, like the district court below, acknowledges that Petitioner Rickman is unable to demonstrate actual prejudice resulting from Attorney Livingston's representation.

Nevertheless, relying principally upon dicta [1] from *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the majority concludes that Rickman need not show prejudice in this case. Instead, the majority presumes prejudice and affirms the district court's grant of a writ of *habeas corpus*, which overturned the nearly twenty-year old conviction of an individual unquestionably guilty of a murder to which he voluntarily confessed and which was described by the Tennessee Supreme Court as "one of the most atrocious and inhuman conceivable." *State v. Groseclose*, 615 S.W.2d 142, 145 (Tenn.1981). In my view, Rickman's case does not fall within the narrow exception discussed in dicta in *Cronic*. Applying the traditional test for prejudice articulated in *Strickland*, I conclude that Rickman's ineffective assistance of counsel claim must fail. I, therefore, respectfully dissent.

## I.

In *Cronic*, the Supreme Court explained in dicta that certain circumstances are so likely to prejudice the accused that the cost of litigating their effect on a particular case is unjustified:

> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.[25] Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.

[25] The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.

*Cronic*, 466 U.S. at 659 & n. 25, 104 S.Ct. at 2047 & n. 25. The Court cautioned, however, that apart from circumstances of this magnitude, there generally exists no basis for find-ing a Sixth Amendment violation unless the defendant can show that counsel's specific errors undermined the reliability of the finding of guilt. *Id.* at 659 n. 26, 104 S.Ct. at 2047 n. 26.

## A.

Courts have been reluctant to apply the *Cronic* dicta broadly. *See, e.g., Scarpa v. Dubois*, 38 F.3d 1, 12–13 (1st Cir.1994) (discussing cases refusing to apply *Cronic*); *Toomey v. Bunnell*, 898 F.2d 741, 744 n. 2 (9th Cir.1990) ("We have applied the *Cronic* exception very sparingly.") This circuit applied *Cronic* in *Green v. Arn*, 809 F.2d 1257 (6th Cir.1987), *vacated on other grounds*, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987), *reinstated*, 839 F.2d 300 (1988) and *Martin v. Rose*, 744 F.2d 1245 (6th Cir.1984). In *Green*, the defendant's counsel was absent during the cross-examination of a key government witness by an attorney for a codefendant. Under these circumstances, we determined that there was prejudice per se, and a reversal of the defendant's conviction was warranted without inquiry into whether the constitutional violation resulted in harmless error. *Green*, 809 F.2d at 1263.

Judge Boggs dissented from the majority's holding to the extent it precluded the application of harmless error analysis. Judge Boggs would have upheld the defendant's conviction, because defense counsel's absence resulted in harmless error. *Id.* at 1264–65 (Boggs, J., dissenting). Judge Boggs rejected the majority's reliance on the dicta in *Cronic* and its discussion of the denial of the right to counsel. He explained:

> The cases cited in *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047 ... and those cited in support of *Cronic* in this opinion, all involve instances where something having to do with the truth-seeking process was prevented by court ruling, or where the part to be played in that process by defense counsel was wholly absent.

1. The language in *Cronic* discussing the instances in which prejudice is presumed has been described as dicta by the First, Sixth, and Eleventh Circuits, *see Scarpa v. Dubois*, 38 F.3d 1, 12–15 (1st Cir.1994); *Hammonds v. Newsome*, 816 F.2d 611, 613 (11th Cir.1987); *Takacs v. Engle*, 768 F.2d 122, 124 (6th Cir.1985), as well as by Judge Boggs in his dissenting opinion in *Green v. Arn*, 809 F.2d 1257, 1264 (6th Cir.1987) (Boggs, J., dissenting).

Here, there is no hint or even speculation that what went into the record or the ears of the jury would have differed if the error had not occurred. Nor is this an instance where counsel's presence to object or take a strategic decision could have been crucial, nor where an opportunity has been irrevocably waived.

*Id.* at 1265 (Boggs, J., dissenting). Judge Boggs concluded: "[i]t elevates form over substance to equate what occurred here to the true denial of counsel cited in *Cronic.*" *Id.*

I think that Judge Boggs had the better reading of the *Cronic* dicta. In any event, the majority opinion in *Green* provides no support for the present case. In *Green,* the majority opinion simply tracked the language of the *Cronic* dicta which "instructed that there is a 'constitutional error without any showing of prejudice when counsel was ... totally absent ... during a critical stage of the proceeding.'" *Id.* at 1262 (quoting *Cronic,* 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25). In addition, the decision in *Green* was a narrow one, as the majority cautioned that some absences by defense counsel might be "so de minimis" that they would not be constitutionally significant. *Id.* at 1261.

We also found prejudice per se in *Martin,* because defense counsel had "stood mute" during trial. Counsel's only participation was to make a brief statement to the jury explaining that the defendant would be relying on certain pretrial motions and that defense counsel would not be taking part in the trial. *Martin,* 744 F.2d at 1247. Counsel did not participate in jury selection, gave no other opening statement, did not cross-examine any of the government's witnesses, called no witnesses for the defense, and offered no closing argument. *Id.* Despite finding that the decision to remain silent was a strategic maneuver to which the defendant did not object, this circuit held that counsel's performance constituted ineffective assistance of counsel. We concluded that there was prejudice per se, since counsel's *total* lack of participation precluded the defendant from subjecting the government's case to "'the crucible of meaningful adversarial test-

ing.'" *Id.* at 1250 (quoting *Cronic,* 466 U.S. at 656, 104 S.Ct. at 2045).

Like *Green,* our decision in *Martin* lends no support to the majority's expansive reading of *Cronic* in the instant case. By refusing to participate at trial, counsel "entirely failed to subject the prosecution's case to meaningful adversarial testing...." *Cronic,* 466 U.S. at 659, 104 S.Ct. at 2047; *see Martin,* 744 F.2d at 1250. The facts in *Martin,* therefore, fall within the language of the *Cronic* dicta.

### B.

As support for its decision, the majority relies primarily upon two opinions from our sister circuits which contain overly expansive and, in my view, unwarranted interpretations of *Cronic.* I shall discuss each opinion in turn. In *United States v. Swanson,* 943 F.2d 1070, 1074 (9th Cir.1991), the Ninth Circuit found prejudice per se where defense counsel conceded in his closing argument to the jury that there was no reasonable doubt as to his client's guilt regarding the only factual issues in dispute. The court concluded that the attorney's conduct had tainted the integrity of the trial. *Id.* The court held that the attorney had abandoned his duty of loyalty to his client and utterly failed to subject the government's case to meaningful adversarial testing. *Id.* at 1074–75.

Judge Wiggins dissented. In his view, defense counsel did the best that he could under the circumstances. *Id.* at 1080 (Wiggins, J., dissenting). Judge Wiggins explained:

It is easy to condemn from our vantage point. We are not before the jury, empty handed, yet charged with the duty of providing an honest defense. We should, I believe, view counsel's performance less critically. He did not concede that his client was guilty. He did, however, admit that there was no reasonable doubt that one element of the government's case was true, namely, that the bank clerks were intimidated by the robber. Such an admission did not cause a collapse in the adversarial system, it did not taint the integrity of the trial, nor was it an abandonment by counsel of his client's defense. If it was

error at all, it was not of the fundamental sort necessary to trigger the *Cronic* exception.

*Id.* Applying the traditional *Strickland* analysis, Judge Wiggins concluded that counsel's representation was not unconstitutional, because any errors made by defense counsel were not prejudicial. *Id.*

I agree with Judge Wiggins' dissenting opinion, because defense counsel's trial errors in *Swanson* were appropriate subjects for the traditional *Strickland* prejudice analysis. *See Childress v. Johnson,* 103 F.3d 1221, 1229 n. 12 (5th Cir.1997) (same); *Scarpa,* 38 F.3d at 12–13 (same). The Supreme Court has stated: "Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. In addition, the Ninth Circuit's expansive interpretation in *Swanson* of the *Cronic* dicta is at odds with its own observation approximately one year earlier in *Toomey,* 898 F.2d at 744 n. 2, that "[w]e have applied the *Cronic* exception very sparingly."

Nevertheless, even if I were inclined to consider *Swanson* correctly decided, I would still find it inapplicable in the present case. *Swanson* can arguably be interpreted as falling within the *Cronic* dicta for the following reason: By conceding the lack of a reasonable doubt as to the only factual issues in dispute, defense counsel failed to subject the prosecution's case to the "crucible of meaningful adversarial testing." *Cronic,* 466 U.S. at 656, 104 S.Ct. at 2045. As I shall discuss, Attorney Livingston's representation in the present case did not fall below that standard.

The majority also relies upon *Osborn v. Shillinger,* 861 F.2d 612 (10th Cir.1988). In *Osborn,* the defendant received the death penalty after pleading guilty to a series of crimes, including felony murder. The Tenth Circuit held that defense counsel was ineffective at both the guilty plea and sentencing stages. The court stated that defense counsel had "so abandoned" his duty to advocate

on behalf of his client "that the state proceedings were almost totally non-adversarial." *Id.* at 628. The court concluded that "[p]rejudice, whether necessary or not, is established under any applicable standard." *Id.* at 629. The *Osborn* court based its decision finding prejudice per se on the following facts: (1) when the defendant decided that he wanted to withdraw his guilty plea, defense counsel made statements to the press indicating that the defendant had no evidence to support his claims and that he was playing a game to attract attention; (2) defense counsel also made statements to the press during the sentencing stage which indicated that the defendant was not amenable to rehabilitation; (3) defense counsel knew or should have known that the prosecutor's office had conveyed *ex parte* information to the sentencing court, yet never sought to discover its contents or counteract its effects; (4) defense counsel stressed the brutality of the crimes at the sentencing hearing and referred to the difficulty incurred in presenting mitigating evidence when the evidence against a client is so overwhelming; and (5) defense counsel informed the trial judge in a letter written subsequent to his client's sentencing hearing that, in essence, counsel's client deserved the death sentence. *Id.* at 628–29. Although he was in the process at that time of arguing his client's appeal, counsel insisted that whether his statements helped his client " 'wasn't my concern.' " *Id.* at 629 (internal citation omitted).

In *Scarpa,* 38 F.3d at 12–13, the First Circuit rejected the *Osborn* court's application of the *Cronic* dicta. The First Circuit explained that the Supreme Court declined to accord presumptively prejudicial status to attorney errors particular to the facts of an individual case. *Id.* The *Scarpa* court stated: "Virtually by definition, such errors 'cannot be classified according to likelihood of causing prejudice' or 'defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid.' *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067." *Id.* at 12.[2] The First Circuit also drew an analogy to the harmless error doctrine and the

---

2. The First Circuit distinguished our decision in *Green* to presume prejudice because defense counsel was *absent* from the courtroom during a critical stage of the trial. *See Scarpa v. Dubois,* 38 F.3d 1, 12 (1st Cir.1994).

distinction between trial errors and structural errors. *See id.* at 14–15. Trial errors must be analyzed under the particular circumstances of each case in order to determine whether actual prejudice, in fact, resulted. *Id.* at 14. Structural errors, on the other hand, "jar the framework in which the trial proceeds." *Id.* Thus, "structural errors so undermine confidence in the fairness and reliability of the proceedings that prejudice is presumed." *Childress,* 103 F.3d at 1230 (discussing *Scarpa* ); *see Scarpa,* 38 F.3d at 14. The *Scarpa* court explained: "The 'common thread' connecting the numerous examples of trial error listed ... in *Fulminante* is that all such errors occur 'during the presentation of the case to the jury,' and therefore may be 'quantitatively assessed in the context of [the] evidence presented' in order to gauge harmlessness." *Scarpa,* 38 F.3d at 14 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991)).

I find the *Scarpa* court's analysis persuasive and agree that defense counsel's errors in *Osborn* were amenable to the *Strickland* analysis. However, even if I were to follow *Osborn,* I would still find it distinguishable from the present case. *Osborn* dealt with an extreme situation where defense counsel abandons his client and "effectively joins the state in an effort to attain a conviction or death sentence...." *Osborn,* 861 F.2d at 629; *cf. Davis v. Executive Director of Dep't of Corrections,* 100 F.3d 750, 759 (10th Cir. 1996) (refusing to apply *Osborn* where defense counsel described the case as "one of the worst ones I have ever seen" and expressed his hatred for the defendant), *cert. denied,* —— U.S. ——, 117 S.Ct. 1703, 137 L.Ed.2d 828 (1997). As I shall discuss, Attorney Livingston did not "join" with the prosecution in the present case to obtain either Rickman's conviction or his death sentence. Attorney Livingston initially attempted, with Rickman's approval, to obtain a plea bargain for his client. After this failed and Rickman was tried and convicted, Attorney Livingston spent nearly three hours arguing to the jury to spare Rickman's life.

## II.

A principal reason given by the Supreme Court for the presumption of prejudice in certain instances was the desire to avoid the cost involved in case-by-case inquiries. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046. Both *Swanson* and *Osborn,* as well as the majority opinion in the present case, frustrate this objective. Once it is necessary for a court to examine the trial record in order to evaluate counsel's particular errors, the resort to a per se presumption can no longer be justified by the goal of avoiding case-by-case litigation. Thus, "[a]n overly generous reading of *Cronic* would do little more than replace case-by-case litigation over prejudice with case-by-case litigation over prejudice per se." *Scarpa,* 38 F.3d at 14. The majority in the present case is a perfect example. First, it spends sufficient time examining the record to allow it to conclude that Rickman could not prevail if he were required to show actual prejudice. The majority rejects Rickman's argument that there exists a reasonable probability that he would not have been convicted of first degree murder had Attorney Livingston investigated and presented a defense of lack of *mens rea.* It then undertakes a second review of the record, highlighting the particular conduct of Attorney Livingston which, in the majority's view, justifies the application of *Cronic.* In doing so, the majority frustrates a principal policy underlying the *Cronic* dicta.[3]

An unnecessarily expansive reading of the *Cronic* dicta frustrates other substantial interests as well; i.e., comity, federalism, and the finality of judgments. In *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982), the Supreme Court observed that "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." Likewise, in *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3391–92, 77

---

**3.** In *Cronic,* 466 U.S. at 658, 104 S.Ct. at 2046, the Supreme Court stated: "There are ... circumstances that are so likely to prejudice the

accused that the cost of litigating their effect in a particular case is unjustified."

L.Ed.2d 1090 (1983), *superseded on other grounds by statute*, 28 U.S.C.A. § 2253(c)(2) (West Supp.1997), the Court explained:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception. When the process of direct review ... comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials. Even less is federal habeas a means by which a defendant is entitled to delay an execution indefinitely.

### III.

The majority has recounted the elements of Attorney Livingston's representation which it believes warrant the application of the *Cronic* dicta in this case, and I need not repeat them here. I do not condone Attorney Livingston's performance, but that is not the issue. As the Supreme Court declared in *Cronic*, 466 U.S. at 665 n. 38, 104 S.Ct. at 2050 n. 38: "We address not what is prudent or appropriate, but only what is constitutionally compelled." In *Cronic*, the Supreme Court explained that the Sixth Amendment is generally not implicated absent an effect on the reliability of the trial process. *Id.* at 658, 104 S.Ct. at 2046. The Court pointed out that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *Id.* I am satisfied that Attorney Livingston did not breach his duty of loyalty to Rickman, create a conflict of interest with his representation, or *entirely* fail to subject the prosecution's case to meaningful adversarial testing, such that the trial's outcome was presumptively unreliable. *See Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067; *Cronic*, 466 U.S. at 658–59, 104 S.Ct. at 2046–47.

The majority finds that Attorney Livingston's representation amounted to a constructive denial of the assistance of counsel. However, the instant case is unlike either of the two examples of constructive denial discussed in *Cronic*. *See Woodard v. Collins*, 898 F.2d 1027, 1028–29 (5th Cir.1990). First, the Supreme Court has consistently found constitutional error without any showing of prejudice where counsel was totally absent or prevented from assisting the defendant during a critical stage of the proceeding. *Cronic*, 466 U.S. at 659 n. 25, 104 S.Ct. at 2047 n. 25. Neither situation occurred here. Second, Attorney Livingston did not *entirely* fail to subject the prosecution's case to meaningful adversarial testing. *Id.* at 659, 104 S.Ct. at 2047.

At the beginning of his representation, Attorney Livingston received a copy of a nine-page confession given by Rickman to the Shelby County District Attorney's Office. Attorney Livingston testified at Rickman's post-conviction relief hearing that he went to the Shelby County jail and left the confession with Rickman to review. One week later, Attorney Livingston visited Rickman again. With respect to this meeting, Attorney Livingston testified:

A: I went back and asked him what part was true and what part was false.

Q: And he told you that it was true?

A: He said, "It's all true."

Q: But you didn't discuss with him the contents of the statement and the implications of it, did you?

A: I went over the statement with him word for word.... He knew what was in it and I knew what was in it. I asked him if he had been advised of his *Miranda* rights and he said that he had. I asked him had he been forced or coerced in any way to give a statement and he said that the police had been nothing but exceptionally good to him.

J.A. at 838.

After Rickman informed him that the confession was accurate, Attorney Livingston determined that he would attempt to persuade the District Attorney to permit Rickman to enter a plea of guilty, accept a life sentence, and thereby avoid Tennessee's electric chair. *Id.* at 836. The District Attorney initially refused to accept the plea but eventually agreed on the condition that Rick-

man, Groseclose, and Britt would all plead guilty and accept life sentences. Attorney Livingston testified that the plea was acceptable to Rickman and Britt but not to Groseclose. As a result, the case proceeded to trial where Attorney Livingston attempted "to persuade the jury that Rickman was 'abnormal and should not be judged as a normal person,' .... and 'to show the jury that we had a sick boy on trial, a subnormal, abnormal human being on trial.... That was my whole object of the whole defense, was try to convince the jury that we had a sick man on trial.'" *Rickman v. Dutton*, 864 F.Supp. 686, 694 (M.D.Tenn.1994) (internal citations omitted). After Rickman was convicted of first degree murder, Livingston argued for approximately three hours during the sentencing stage in an attempt to convince the jury to spare Rickman from the electric chair.

The district court found that Attorney Livingston devoted sixteen hours to pre-trial preparation. *Id.* Attorney Livingston testified that he explained to Rickman the elements of first degree murder in Tennessee and the punishment for a conviction. Attorney Livingston reviewed the statements incriminating Rickman which Britt and Mount had given following their arrests. Notwithstanding Rickman's statement that his confession was voluntary, Attorney Livingston filed a pre-trial motion to suppress Rickman's confession. Attorney Livingston also filed a motion to sever Rickman's case from those of his co-defendants. Both motions were denied. Moreover, Attorney Livingston requested a psychiatric evaluation with respect to whether Rickman was competent to stand trial. The psychiatrist who examined Rickman determined that he was, in fact, competent.

From the moment Attorney Livingston learned that Rickman's nine-page confession was accurate and lawfully obtained, Attorney Livingston's sole purpose was to persuade the District Attorney to accept a guilty plea and life sentence for Rickman, thus sparing him from Tennessee's electric chair. After the plea bargain failed, Attorney Livingston testified that he attempted to portray Rickman to the jury as an abnormal human be-

ing. Attorney Livingston's tactics must be understood precisely for what they were; i.e., a last ditch attempt to persuade the jury to spare Rickman from the electric chair. These are certainly not the actions of a defense counsel who was allegedly so hostile to his client's interests that he functioned as a "second prosecutor." Maj. op. at p. 1157.

In *Strickland*, the Supreme Court cautioned that courts must review the performance of an attorney with a "heavy measure of deference," *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066, and make every effort "to eliminate the distorting effects of hindsight," *id.* at 689, 104 S.Ct. at 2065. In addition, the Court explained that the reasonableness of an attorney's actions may be determined or substantially influenced by the defendant's own statements or actions. *Id.* at 691, 104 S.Ct. at 2066–67. In the instant case, Attorney Livingston was representing a defendant on trial for one of the most atrocious murders imaginable. Attorney Livingston had been informed by Rickman that the nine-page confession he provided to the District Attorney detailing the murder was completely voluntary and entirely accurate. Moreover, Attorney Livingston had read the incriminating statements provided to the District Attorney by Britt and Mount. Under these circumstances, I do not find that Attorney Livingston's representation amounted to a breach of his duty of loyalty to Rickman or that Attorney Livingston *entirely* failed to subject the prosecution's case to meaningful adversarial testing. We should recall Clarence Darrow's famous statements in defense of Nathan Leopold, Jr. and Richard Loeb, who faced the death penalty after they pled guilty to the kidnap and murder of a fourteen-year-old boy: "I do not know how much salvage there is in these boys. I hate to say it in their presence, but what is there to look forward to? I do not know but that Your Honor would be merciful if you tied a rope around their necks and let them die...." *Attorney for the Damned* 84 (Arthur Weinberg ed., 1957). Although Attorney Livingston's representation certainly did not equal that of Clarence Darrow, it nonetheless satisfied the minimum standard required by the Constitution.

IV.

Since I agree with the majority, as well as the district court, that Rickman is unable to show that his defense was actually prejudiced by Attorney Livingston's representation, I would reject Rickman's ineffective assistance of counsel claim. From the majority's holding to the contrary, I respectfully dissent.