IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 27, 2001 Session

## RALPH E. THOMPSON, JR. v. STATE OF TENNESSEE

**Direct Appeal from the  Circuit Court for Cocke County**
**Nos. 21,112; 22,564      Ben W. Hooper, II, Judge**

---

**No. E2001-00003-CCA-R3-PC**
**March 14, 2002**

---

The petitioner appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of trial counsel.  The complaints against trial counsel were as to their alleged failure to prepare adequately for trial,  to interview and present certain witnesses, and to present an adequate defense.  After a careful review of the record, we affirm the judgment of the post-conviction court dismissing the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Charles I. Poole, Sevierville, Tennessee, for the appellant, Ralph E. Thompson, Jr.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; and Alfred C. Schmutzer, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The petitioner, Ralph E. Thompson, Jr., was convicted in 1991 of first degree murder and conspiracy to commit first degree murder, based on his involvement with a friend, Jonathan Stephenson, in the killing of Stephenson's wife.  The jury sentenced him to life on the murder conviction and the trial court sentenced him to twenty-five years on the conspiracy conviction, ordering that the sentences be served consecutively. On the initial direct appeal, this court affirmed the convictions, but remanded for a new sentencing hearing on the conspiracy conviction, with directions to the trial court to make specific findings of fact as required by the Sentencing Reform Act of 1989. See State v. Ralph Thompson, Jr., No. 03C01-9201-CR-00006, 1992 Tenn. Crim. App. LEXIS 839 (Tenn. Crim. App. Nov. 10, 1992).  Following the new sentencing hearing, the trial court once again imposed a twenty-five-year consecutive sentence.  On appeal, this court concluded that the sentencing guidelines required concurrent, rather than consecutive, sentences and that the trial court erred in its application of enhancement and mitigating factors.  Accordingly, the defendant's

conspiracy sentence was modified to twenty-two years, to be served concurrently to his life sentence. See State v. Ralph Thompson, Jr., No. 03C01-9306-CR-00177, 1994 Tenn. Crim. App. LEXIS 366 (Tenn. Crim. App. June 15, 1994).[1]

On July 21, 1994, the petitioner filed a *pro se* petition for post-conviction relief, alleging, *inter alia*, that he was denied effective assistance of trial counsel. Following the appointment of post-conviction counsel, the petitioner filed an amended petition on November 24, 1999, alleging that his two trial counsel were ineffective for failing to adequately investigate and prepare his case. Among other things, the petitioner alleged that trial counsel failed to adequately prepare for the suppression hearing, failed to interview potential defense witnesses or effectively cross-examine State witnesses, and failed to develop and present an adequate theory of defense. On appeal to this court, the petitioner alleges that trial counsel were deficient in the following five ways:

I.      Trial counsel failed to interview witnesses whose names were provided either by the State of Tennessee or by the [petitioner];

II.     Trial counsel failed to develop a reasonable theory of defense, including voluntary intoxication;

III.    Trial counsel conducted an inadequate investigation of facts and circumstances prior to trial;

IV.     Trial counsel's time spent with [the petitioner] was wholly inadequate to properly prepare either the case or the [petitioner] for trial;

V.      Trial counsel's complete abandonment of a trial strategy of a presumption of innocence to one of mitigation of sentence just before start of trial constituted a total abandonment of any trial strategy or defense.

Only one of the petitioner's trial counsel was still living at the time of the September 18-19, 2000, evidentiary hearing on the petition for post-conviction relief. Counsel testified that he had been practicing law since 1962 and had handled "numerous" criminal cases, including "more than ten" first degree murder cases, during the period of his career when he was in criminal practice.

---

[1]Jonathan Stephenson was convicted in 1990 of first degree murder, for which he was sentenced by the jury to death, and of conspiracy to commit first degree murder, for which he was sentenced by the trial court to a consecutive twenty-five-year sentence. The convictions were affirmed but remanded for resentencing. State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994). Subsequently, Stephenson was sentenced to life without parole for the first degree murder conviction, but this matter was also remanded for resentencing because the sentence was not a statutorily authorized punishment at the time of the offense. Stephenson v. Carlton, 28 S.W.3d 910 (Tenn. 2000).

Although his co-counsel had been appointed, he had been retained by the petitioner's mother to assist in the defense. He and co-counsel had jointly prepared a list of their meetings with the petitioner, which reflected a total of eight hours and twenty-five minutes spent in conference with the petitioner prior to trial. However, he was confident they had met with the petitioner at additional times that were not recorded on their list.

Trial counsel said that he and co-counsel reviewed discovery information with the petitioner and interviewed numerous witnesses and potential witnesses in the case, including ones whose names were provided by the petitioner and whom they determined might be able to provide useful information that would be admissible at trial. Among the witnesses trial counsel could recall interviewing were the petitioner's friend and coconspirator, Jonathan Stephenson, who was convicted of conspiracy to commit first degree murder and first degree murder in a separate trial and received a sentence of death; Michael Litz, who testified at the petitioner's trial that the petitioner was present during a conversation in which Stephenson offered Litz $5000 to kill his wife; the petitioner's wife and mother; various character witnesses; and numerous law enforcement officials involved in the investigation of the case. Trial counsel could not recall if he had questioned the petitioner's wife about a telephone call that the petitioner allegedly received from Stephenson regarding the murder, and had no memory of the petitioner's having told him that he was with an employer at the time the telephone call was made.

Trial counsel testified that the petitioner had been receptive to a plea offer, and had indicated his willingness to accept a sentence of life with parole. They had attempted to negotiate that plea, but the State would not agree. Trial counsel said he and co-counsel had filed numerous motions in the case, including a motion to suppress the petitioner's confession, which was denied. The admission of the petitioner's detailed confession presented a major hurdle to overcome, changing the issue from one of "guilt or innocence" to one of "life or death." They had, therefore, attempted to present mitigating circumstances in order to sway the jury from a death penalty to a lesser sentence. Although they may not have told the petitioner in "specific terms" what they were doing, they had advised him that because his statement was going to be admitted into evidence, they were going to have to try to find some way to "lessen the sentence from death." Trial counsel believed he and co-counsel had been successful in their defense and felt they had saved the petitioner's life.

The petitioner testified that trial counsel visited him in jail only "[t]hree or four or five times each." He said counsel failed to provide him with discovery, and failed to keep him informed about his case. He had provided trial counsel with a list of witnesses to call on his behalf, but, to his knowledge, counsel never interviewed the people whose names he provided. Trial counsel had not contacted David Robertson, who, the petitioner claimed, could have provided him with an alibi and would have been able to testify about how much he had had to drink and how he was dressed the evening of the murder. The petitioner also complained that trial counsel failed to effectively cross-examine State witnesses.

The petitioner testified that he had gained access, after his trial, to the public defender's file on Stephenson, where he had discovered statements taken from various individuals who could have

provided favorable testimony in his case. The petitioner spent a good portion of his direct testimony simply reading from these investigative reports and statements, which were subsequently made exhibits to the record. He acknowledged on cross-examination that a number of these individuals had, in fact, testified at his trial. Further, he acknowledged that he had fired the first lawyer who was appointed to represent him, but had made no efforts to fire his subsequent trial counsel.

David Robertson, the office manager at the trucking company where Stephenson worked, testified at the post-conviction hearing that he remembered Stephenson and the petitioner dropping by his house on two separate occasions before the murder. He could not remember the exact dates, or the time interval between the visits. The first visit, he said, was prearranged, while the second visit was unexpected. During their first visit, the petitioner talked to him about a possible job opening at his company, and he told him that he would introduce him to the shop foreman the next day. During the second, unexpected visit, Stephenson told him that they were going to kill Stephenson's wife and asked him to tell the police, if asked, that they had not left his home until 9:00 or 9:30 p.m.

Robertson was unable to remember any argument between the petitioner and Stephenson concerning the purpose of their visit, what the petitioner looked like, or whether the petitioner had been drinking. He testified that when he later picked Stephenson up at the airport, Stephenson used the word "we" to tell him that they had killed his wife. Robertson believed that an investigator working on behalf of Stephenson's attorney had interviewed him, but could not remember having been contacted by any investigator on behalf of the petitioner's counsel.

No witnesses other than the one surviving trial counsel, the petitioner, and David Robertson testified at the hearing on the petition for post-conviction relief. At the conclusion of the hearing, the court issued oral findings of fact and conclusions of law addressing each of the allegations raised by the petitioner in both his *pro se* and amended petitions for post-conviction relief. With respect to the petitioner's allegations of ineffective assistance in his amended petition, the court found that, given the testimony of law enforcement officials and the petitioner himself, it would have been impossible for any lawyer to have succeeded in having the petitioner's confession suppressed; that the confession was the focus of the case against the petitioner; and that a reading of the transcript of the trial revealed "absolutely nothing that would suggest ineffective assistance of counsel." The court further found that the petitioner had failed to show any prejudice resulting from trial counsel's alleged failure to interview or call witnesses in the petitioner's defense. In this respect, the post-conviction court observed that "every one" of the individuals whose statements the petitioner had read would have been "totally devastating" to his case with proper cross-examination. The court additionally found that the petitioner failed to show that counsel were deficient with regard to the amount of time they spent with him prior to trial, and that the petitioner's claim that their mitigation defense was tantamount to no defense at all was a mere "conclusory allegation," insufficient to support a claim of ineffective assistance of counsel. Subsequently, on December 13, 2000, the court entered a brief written order denying the petition for post-conviction relief. The written order states that the petitioner was afforded a full and liberal hearing; that the record contains nothing to suggest ineffective assistance of counsel; and that he failed to meet his burden of proof on any of his claims

of ineffective assistance. Following the denial of his petition, the petitioner filed a timely notice of appeal to this court.

## ANALYSIS

The findings of fact of the post-conviction court are conclusive on appeal, unless the evidence preponderates against the findings, see State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999) (citing State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)), and the appellate court cannot "reweigh or reevaluate" the evidence. Id.; see also Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997), cert. denied, 525 U.S. 830, 119 S. Ct. 82, 142 L. Ed. 2d 64 (1998). However, the appellate court's review of the application of the law to the facts is *de novo*, without a presumption of correctness. See Burns, 6 S.W.3d at 461; Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997). Additionally, issues as to whether counsel was ineffective and whether prejudice resulted are mixed questions of law and fact. Burns, 6 S.W.3d at 461 (citing Goad v. State, 938 S.W.2d 363 (Tenn. 1996)).

The petitioner's original post-conviction petition in the capital case was filed on July 21, 1994, and is therefore controlled by Tennessee Code Annotated Sections 40-30-101 to -124 (repealed). Accordingly, the petitioner must prove the allegations contained in this petition by a preponderance of the evidence. See State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991); Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App. 1991).

The issue that the petitioner presents on appeal is whether the post-conviction court erred in finding that he received effective assistance of trial counsel. In order to establish a claim of ineffective assistance of counsel, the petitioner bears the burden of proving both that his counsel's performance was deficient, and that counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The Strickland Court articulated the standard as a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed

> rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

To satisfy the prejudice prong of the test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim"). If the petitioner fails to meet either prong of the Strickland test, his claim of ineffective assistance of counsel must fail.

The post-conviction court is required to set forth written findings of fact and conclusions of law for each claim that is raised in a petition for post-conviction relief. See Tenn. Code Ann. § 40-30-211(b) (1997). However, when the court makes adequate oral findings of fact and conclusions of law from the bench, the failure to state findings of fact and conclusions of law in the final written order may constitute harmless error. See State v. Higgins, 729 S.W.2d 288, 290-91 (Tenn. Crim. App. 1987); State v. Swanson, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984). In this case, the post-conviction court issued detailed oral findings of fact and conclusions of law at the evidentiary hearing, addressing each of the petitioner's claims in both his *pro se* and amended petitions. Since those oral findings of fact and conclusions of law clearly set forth the court's reasons for dismissing the petition, we conclude that the failure to issue written findings of fact and conclusions of law in this case constitutes harmless error. See George v. State, 533 S.W.2d 322, 326 (Tenn. Crim. App. 1975) (stating that purpose of statute requiring written findings is to aid appellate review).

On appeal, the petitioner contends that trial counsel were ineffective by failing to fully investigate his case, failing to interview or call witnesses whose names had been provided to them

-6-

by the petitioner or by the State, and failing to develop a theory of defense. He argues that the time trial counsel spent in preparation for his case was wholly inadequate, in light of the fact that he was facing a charge of first degree murder, and that they were deficient for failing to call, interview, or cross-examine witnesses who could have offered testimony in support of a defense of voluntary intoxication, which would have negated the element of intent required for a first degree murder conviction. The petitioner alleges that counsel "abandoned all efforts of defense to concentrate upon mitigation at sentencing," thereby "effectively robb[ing]" him of "any representation whatsoever," and making it unnecessary for him to demonstrate actual prejudice in order to show that he was deprived of the effective assistance of counsel.

Before reviewing the individual complaints made by the petitioner against his trial defense counsel, it will be helpful to consider certain of the proof against the petitioner on the eve of trial. The trial court had denied a motion to suppress the defendant's statements, resulting in David Davenport, a special agent with the Tennessee Bureau of Investigation ("TBI"), being permitted to testify as to a statement made to him by the defendant, a portion of which is as follows:

> **Q.**     All right. When – if you would, please, just begin with that statement, and tell us what he told you.
>
> **A.**     This is a statement of Ralph Edward Thompson, Jr., 1083 Central Church Road, Morristown, Tennessee, taken at 8:30 p.m., December the 5th, 1989.
>
> "I've known John Stephenson approximately nine years. Three or four months ago, John started asking me if I could find somebody to get rid of Lisa. He asked me if Mike Litz would do it. John talked about using shotgun slugs, and stuff like that on Lisa. I did ask Mike if he would do it. This was two or three months ago. He said he would think about it. John talked about getting rid of Lisa to Mike. He told Mike and me he would pay $5,000 for someone to get rid of Lisa. Mike said he would think about it, but he never did talk about it anymore.
>
> John kept discussing killing Lisa. He told me he would give me his boat and truck to get rid of Lisa. Approximately a week ago, John Stephenson asked me if I knew a place that was out of the way where he could get rid of Lisa. I told him the only place I could think of was out near my uncle's, Brian Duffy. Brian lives near Brunnard's Grove in Cocke County. I gave him directions on how to get to my uncle's place.
>
> I told him there was a few houses on this gravel road he lives on, other than that, it's isolated, and it goes out through there a long

way. I never took him to my uncle's place, but a couple of days before Lisa was killed, John told me he had found the gravel road. He told me he went up by a church and a little store.

On Saturday night, December the 2nd, 1989, John came by the house. Bud O'Neal was at the house, and we discussed cutting some fire wood. John didn't say anything about getting rid of Lisa. On Sunday, I went over to John's to cut some wood. Mike was with me. John started talking to me. He said, "We found a place." John described the place as being a gravel road, and there was a pull off near a new fence. Lisa was to come to that place to pick up some money that John had got for running some drugs or something. That was what John had told Lisa.

I asked John what was going to happen to the kids, and he said that they would be all right, that Lisa's dad always came up to check on them when he gets off work. John told me he had to go to Dandridge to pick up his trailer, that he was going back to his house, and get ready for work. He said he would be at my house around 7:30 p.m., and that he wanted me to have my rifle. John got to the house around 7:30 p.m., December the 3rd, 1989. He was driving his Mazda pickup truck, white in color.

I set the rife, a Winchester 30/30 level action out the window of the baby's room. It was already loaded with about five shells. I got the rifle, and put it in the seat. John was driving. We left, and stopped, and got $5 worth of gas at the Shell station near Sky City.

We went over to Dave Robertson's house. We stayed at Dave's house about 15 minutes. He told Dave when we left that if anybody asked, we didn't leave his house until 9:45 p.m. I think Dave might have known what was going on, but I'm not for sure. When we left Dave's house, John was driving. He said Lisa was supposed to be over on the gravel road near my uncle's in Brunnard's Grove. He told me she was supposed to be in a pull off near a new fence.

We left Dave's, went out 160 by Enka to Brunnard's Grove. We turned left off the highway. We drove by a little store, then went out a gravel road, maybe a mile or so. We parked for about 10 minutes. During the time we were parked, we saw one Toyota truck. We saw some headlights coming. We drove down the gravel road near a pull off. John got out of the truck, and took the 30/30 rifle. I

drove up the road a piece. I saw the car pull up, and back in with the back of the car towards the fence.

I got out of the truck, and was looking around. In about 15 minutes, I heard one shot. I got back in the truck. I looked down, and saw the car was Lisa's. She drives a white Dodge Shadow. I went to where the car was, and John ran off the bank across the road from where the car was. I glanced over, and saw Lisa slumped back in the car. John got in with the rifle, and started driving. I asked John what in the hell he'd done. That was murder, and John said, "No, it was like shooting a deer."

John said he was ruined either way. I asked him what about the kids, and he said they would be all right with Lisa's dad. We left there. I shot the gun up in the air. I gave John two shell casings from the 30/30. John had gloves on. I went with John straight to JIT truck lines. He wanted me to put the gun behind the seat of the pickup, but I couldn't get the seat up. I left John at JIT, and drove straight home.

I got home around 10:15. I took the gun in, and cleaned it the next day. I went over to JIT the next day, and asked about a job. I didn't find out Lisa was actually dead until the police came to my house on Monday night. We had made up the – John had the alibi figured on Sunday night that we told police before the shooting. John told me to stick to my story, that it would all blow over.

John asked me if I had cleaned the gun, and I told him, "Yes," and that the police had the gun he had used. John didn't tell me where he had gotten rid of the shells. He said he would get rid of them on the way to Ohio.

I have read this statement consisting of 5-1/4 pages, and it is the truth to the best of my knowledge, so help me God. Signed Ralph E. Thompson, Jr., Sworn to and read by Ray Presnell, taken by Special Agent David Davenport, 10:00 p.m., December the 5th, 1989."

Although reading aloud the statements of potential witnesses during his testimony at the post-conviction hearing, the petitioner did not attempt to relate them to the proof against him, or show how their testimony could have advanced his defense. It is necessary for us to do so in determining whether prejudice has been established by counsel's not interviewing or calling certain of these witnesses to testify.

We agree with the post-conviction court that a review of the statements of the petitioner's wife and cousin demonstrates that these potential witnesses would have been damaging to the petitioner's defense had they testified at his trial. During his testimony at the post-conviction hearing, the petitioner read the lengthy statement of his wife, Debbie Thompson, apparently believing that, although without explaining in what manner, her testimony as to the facts would have assisted his defense. However, our examination of her statement, made an exhibit to the hearing, causes us to conclude otherwise. For instance, she said in the statement that, on the night of the homicide, her husband had put in the front bedroom of their house the rifle with which the victim was killed but that she had "no idea" whether he had set the gun out the window, as was alleged. In fact, this testimony would have corroborated a portion of his statement to TBI Agent Davenport. She told the interviewer that her husband had left that night about 8:00 p.m. with Jon Stephenson and had not returned until about 10:30 p.m. She said that "[s]he was concerned as to where he had been because he was only supposed to be gone for a little while." His behavior was unusual when he returned, for "he did not say anything" but "came in and sat down in front of the TV and didn't talk to anybody and then just went back to his room for the night." The petitioner's wife said that this behavior "was completely unlike Ralph who is normally very talkative and easy to get along with." In the petitioner's view, his trial counsel were ineffective, *inter alia*, because "they never put my wife on the stand to explain some of these things." However, he did not advance a theory as to how his defense would have been aided by his wife's explaining "some of these things."

Jerry Dixon, the petitioner's cousin, related in his statement, as read by the petitioner, that, on the night of the homicide, the petitioner and Jon Stephenson had left at about 8:30 p.m., the petitioner saying "he'd be back 30 minutes tops." Dixon was "surprised" when the petitioner did not return until an hour and a half later, describing that "when he came in, he was like stone. He didn't say anything to anybody, he just went to bed. This was not at all like Ralph, he is always happy-go-lucky [and] talkative." Dixon later visited the petitioner in jail, who explained what had happened that evening by saying that he had gone with Stephenson to "pick up some drug money" and that Stephenson, with the weapon, had gotten out of their vehicle, the petitioner "heard a shot [and Stephenson] came back and said 'she's dead . . . it was as easy as killing a deer' or something like that." As to the importance of this potential witness, the petitioner testified that "[w]here I don't agree with some things, I think he got confused [sic] it was the next day later but he should have been talked to." Again, the petitioner does not attempt to explain how this testimony could have been other than corroborative of his statement to Agent Davenport and devastating to the defense. Thus, it appears that the testimony of the petitioner's wife and cousin would have been helpful to the prosecution, not the defense.

The petitioner asserted at the evidentiary hearing that another potential witness, David Robertson, could have testified that the petitioner had been drinking heavily, and had a beer in his hand, when he and Stephenson arrived at Robertson's home the evening of the murder. He further claimed that Robertson could have provided him with an alibi. However, when questioned at the evidentiary hearing, Robertson had no memory of the petitioner's drinking, and a review of the statement he gave to Stephenson's investigator before the trial shows that he made no mention of the petitioner's having been intoxicated when he arrived at his home. Moreover, rather than

providing the petitioner with an alibi, Robertson's testimony at the post-conviction hearing shows that he, also, would have been devastating to the petitioner's case had he testified at trial. Robertson testified at the evidentiary hearing that the petitioner and Stephenson came to his house unexpectedly the night of the murder, that Stephenson told him that they were going to kill his wife, and that he asked Robertson to provide them with an alibi. Robertson later picked Stephenson up at the airport, and Stephenson, using the word "we," told him that they had accomplished the deed. Robertson could not remember how the petitioner was dressed, and had no recollection of the petitioner's having argued with Stephenson about the purpose of their visit. Robertson's testimony, therefore, would not have supported the petitioner's claim that he had not known of Stephenson's purpose when he accompanied him on the night of the murder.

Further weakening the petitioner's complaints as to certain potential witnesses, as the post-conviction court observed, a number of the witnesses whom the petitioner believes should have been presented as witnesses actually did testify at the trial. The transcript of the petitioner's trial shows that H.A. Saylor, Bob Denny, and Mike Litz all testified as prosecution witnesses during the initial phase of the trial; and Debbie Thompson, the petitioner's wife, testified during the punishment phase. Further, the activity records of trial counsel show that they interviewed Sheriff Charles Long and Debbie Thompson prior to the trial, as well as Jonathan Stephenson, after they had attended his four-day trial.

As evidence that trial counsel were ineffective for failing to develop voluntary intoxication as a possible defense, the petitioner cites the following exchange during trial counsel's cross-examination of State witness Michael Litz:

> **Q.** I mean some of Ralph's relatives came over to watch the movies and you all sat around and watched the movies and drank a beer.
>
> **A.** Yes, sir.
>
> **Q.** Did [the petitioner] have a beer or two?
>
> **A.** Yes, sir.

The petitioner contends that trial counsel should have persisted in questioning Litz about the amount of beer that the petitioner drank that evening. However, nothing in Litz's direct testimony indicated either that the defendant was intoxicated, or that he could have possibly had enough beer to make voluntary intoxication a plausible defense. In order to succeed with a defense of voluntary intoxication, a defendant must not only prove that he was intoxicated, but also that his level of intoxication deprived him of the mental capacity necessary to form specific intent. State v. Burkley, 804 S.W.2d 458, 461 (Tenn. Crim. App. 1990) (quoting Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979)). Just prior to the exchange quoted above, Litz testified that he and the petitioner had spent the afternoon cutting wood, before driving to town to rent movies and buy a case

of beer. He said that they brought the beer and movies back to the petitioner's house, where they were joined by the petitioner's wife, as well as his aunt and cousin. The petitioner watched movies with the group until 7:30 p.m., when Stephenson arrived to ask if he had forgotten his job interview. Upon Stephenson's arrival, the petitioner jumped up, took a shower, and then left the house with Stephenson. Thus, according to Litz's account, there would have been little time for the petitioner to have become intoxicated. In the absence of any evidence of the petitioner's intoxication, we cannot conclude that trial counsel were deficient for failing to pursue the issue as a possible defense.

Even if we accept the witness statements read into the record by the petitioner at the post-conviction hearing as proof of what their trial testimony would have been, we simply cannot conclude that the petitioner has established that he was prejudiced by counsel's not interviewing certain of these witnesses or presenting their testimony during the trial. We conclude that he has failed to establish the prejudice prong of the Strickland test, that but for "counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S. Ct. at 2068; see Hendricks v. Calderon, 70 F.3d 1032, 1042 (9th Cir. 1995), cert. denied, 517 U.S. 1111, 116 S. Ct. 1335, 134 L. Ed. 2d 485 (1996) ("Absent an account of what beneficial evidence investigation into any of these issues would have turned up, Hendricks cannot meet the prejudice prong of the Strickland test."); United States v. Ashimi, 932 F.2d 643, 649 (7th Cir. 1991) (stating that a petitioner cannot establish prejudice without showing "what the attorney would have discovered after 'adequate' investigation").

The petitioner also failed to show that counsel were deficient by the amount of time they spent in preparation for the case. Trial counsel testified that he and co-counsel interviewed a number of potential witnesses in the case, including those whose names were provided by the petitioner and whom they had determined might be able to provide useful information at trial; filed numerous motions, including a motion to suppress the petitioner's confession; and met with the petitioner at least five times to discuss and review his case. Although trial counsel's records reflected only 8.25 hours spent in conference with the petitioner, and another 10.75 spent in "[t]rial prep[.]," he testified that he and co-counsel had not recorded all the time that they spent on the petitioner's case. He believed he and co-counsel had been successful in their defense and felt they had saved the petitioner's life.

Entered as exhibits during counsel's testimony were a list of motions and other pleadings which they filed on behalf of the petitioner, as well as time sheets. Although it is unclear when the petitioner's trial counsel replaced his first attorney, the first entry on the time sheet is December 6, 1989, apparently for the review of the "Affidavit of Complaint/Arrest Warrant (Ralph Thompson)." The list of entries, describing for the most part motions filed, between this first entry and May 20, 1990, the date of the first activity recorded on the separate billing records, covers nearly two pages of legal-size paper with single-spaced type. Among the entries are a motion for an independent psychological evaluation (February 7, 1990), motion for bail (March 29, 1990), motion to suppress statements (April 5, 1990), motion to suppress (April 16, 1990), and motion to declare Ralph Thompson indigency [sic] and to appoint second counsel to assist in trial (April 24, 1990). Given both the nature and the number of these filings, it is difficult to envision that counsel's first meeting

with the petitioner did not occur until June 26, 1990, which is the first shown on the activity sheets. The post-conviction court did not find merit in the petitioner's allegations of insufficiency of trial counsel, based upon time deficiencies, and this court, likewise, cannot infer that petitioner's counsel spent insufficient time in trial preparation. A review of the listing of the motions and pleadings filed on behalf of the petitioner and the billing activity records supports trial counsel's testimony that the records do not show all of the time that trial counsel devoted to this matter. As we have previously discussed, the petitioner has failed to show how the various tasks that he believes trial counsel should have performed would have been helpful to his defense.

The activity records of trial defense counsel contradict the petitioner's assertion that the only "fact" witnesses that trial counsel contacted, other than TBI agents, was Mike Litz. The records reflect that trial counsel attended the trial of Jonathan Stephenson from September 15-18, 1990, and interviewed him and a "Randy Hurley" in Nashville on December 27, 1990. We note that, according to the opinion of our supreme court in State v. Stephenson, 878 S.W.2d 530, 535-36 (Tenn. 1994), nonlaw enforcement witnesses testifying during the trial of Stephenson were H.A. Saylor, Julie Webb, Glen Brewer, Dave Robertson, and Michael Litz. Thus, by attending this trial, the petitioner's defense counsel, presumably, learned of the relevant knowledge of these witnesses.

We distinguish this matter from Shannon Smith v. State, No. W1999-01708-CCA-R3-PC, 2001 Tenn. Crim. App. LEXIS 369 (Tenn. Crim. App. May 15, 2001), relied upon by the petitioner to show that trial counsel's preparation in the instant case was inadequate. We note that, in Smith, one page of notes had been made by counsel and his investigator as to their pretrial investigation. Although timing was critical to the defense, with the records showing the defendants were at one location at 8:55 p.m. and the crime occurred at another location at 9:12 p.m., counsel did not adequately investigate the travel time from one location to the other. Smith had always maintained his innocence, and the post-conviction court concluded that the 10.25 hours, which included three hours devoted to the guilty plea, were inadequate. The instant case is quite different. Unlike Smith, this petitioner inculpated himself, although claiming that Stephenson fired the fatal shot. Activity records in the instant case reflect that counsel spent at least 164 out-of-court hours on the matter, mostly before the trial, and attended the four-day trial of the co-perpetrator. Additionally, unlike Smith, who had a potential impossibility defense based upon the difficulty in traveling from one location to another in time to commit the crime, the petitioner in the instant case has not identified anything that would have been achieved by counsel's devoting more time to the matter or with him. We simply cannot infer inadequacy of counsel from time records whose completeness is suspect.

Finally, we conclude that there is no merit to the petitioner's allegation that trial counsel's concentration on mitigation evidence constituted a total abandonment of his defense. The petitioner gave a very detailed and damaging confession in this case, revealing that he introduced Stephenson to Litz as a possible assassin several months before the murder, suggested a murder location when Litz refused the job, provided the murder weapon, accompanied Stephenson to the murder scene, and cleaned and hid the weapon after the murder was completed. In light of this confession, which trial defense counsel had sought to have suppressed, we cannot conclude that it was unreasonable for counsel to concentrate on avoiding the imposition of death rather than incarceration. See Chandler

v. United States, 218 F.3d 1305, 1315-16 (11th Cir. 2000), cert. denied, 531 U.S. 1204, 121 S. Ct. 1217, 149 L. Ed. 2d 129 (2001) ("[T]o show that the [lawyer's] conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."); Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (noting that conduct of counsel is unreasonable only upon a showing "that no competent counsel would have made such a choice").

Furthermore, a review of the trial transcript reveals that trial counsel did not, as the petitioner claims, abandon all attempts to prove his innocence of the crimes. Prior to the presentation of proof, defense counsel argued various motions in limine in an attempt to prevent damaging information from reaching the jury. Trial counsel extensively cross-examined the police detective who read the defendant's confession at trial, eliciting the information that the statement was not verbatim, and did not include everything that the petitioner said during the course of his interviews. Trial counsel also elicited the information that no fingerprints were found on the gun, that police had been unable to link the bullet fragment from the murder scene to the gun, and that soil samples taken from Stephenson's truck, which the petitioner had driven the night of the murder, did not match soil samples from the murder scene. In addition to arguing mitigation at closing, trial counsel also argued that the petitioner had inadvertently provided the gun to Stephenson, and thus was not guilty of first degree murder. Trial counsel's attempts to present evidence in mitigation did not constitute an abandonment of the petitioner's defense, as occurred in Rickman v. Bell, 131 F. 3d 1150, 1160 (6th Cir. 1997), where trial counsel was ineffective because of "portray[ing] his client as vicious and abnormal." Here, defense counsel were trying to cope with the evidentiary impact of the petitioner's confession. Appellate courts must recognize that "[t]here are countless ways to provide effective assistance in any given case" and that "the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Accordingly, we conclude that the record supports the post-conviction court's conclusion that trial defense counsel were not ineffective in their choice of a defense. Counsel testified that their aim was to avoid imposition of the death penalty, and they were successful in this regard.

Implicit in the post-conviction court's findings was that the petitioner failed to demonstrate either that his trial counsel were ineffective or that he was prejudiced by counsel's actions. The record on appeal supports the findings of the post-conviction court in this regard.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the order of the post-conviction court denying the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-14-