**In re GLENN; Glenn et al., Appellants.**

[Cite as *In re Glenn* (2000), 139 Ohio App.3d 105.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 76481 and 76492.

Decided Oct. 30, 2000.

106

*Jessica Gadsden* and *Martin Keenan,* for appellant Shelly Glenn.

*Anthony A. Gedos* and *Michael K. Astrab,* for appellant Patrick Young.

*Sara E. Jones,* Cuyahoga County Assistant Prosecuting Attorney, for appellee C.C.D.C.F.S.

*Gerald Kovacik,* for guardian *ad litem.*

---

PATRICIA ANN BLACKMON, Judge.

In this consolidated appeal, appellants Shelly (also spelled "Shelley" in the record) Glenn and Patrick Young appeal a decision by the Cuyahoga County Court of Common Pleas, Juvenile Division, granting permanent custody of their children, Dustin, Destiny, and Diamond Glenn, to appellee Cuyahoga County Department of Children and Family Services ("CCDCFS"). Shelly Glenn assigns the following two errors for our review:

"I. The Cuyahoga County Prosecutor failed to show by clear and convincing evidence that mother Shelly Glenn failed to remedy the conditions that prompted the removal of her children from her home.

"II. Appellant/mother Shelly Glenn's counsel rendered ineffective assistance."

Appellant Patrick Young assigns the following error for our review:

"I. The trial court erred by granting CCDCFS permanent custody of the involved minor children where the natural father was incarcerated during the relevant time period when completion of the case plan was to have occurred

although having no meaningful opportunity or facilities by which to fully and completely comply with his case plan and he otherwise established a continuing interest in taking steps toward regaining custody by taking some related courses and programs while incarcerated and by attending the permanent custody hearing and testifying therein explaining his good faith efforts and continuing efforts and improvement."

Having reviewed the record and the legal arguments of the parties, we affirm the judgment of the trial court. The apposite facts follow.

The juvenile court awarded permanent custody of Dustin (five years), Destiny (three years), and Diamond (seventeen months) to CCDCFS on its neglect complaint against parents Shelly Glenn (twenty-two years) and Patrick Young (thirty-six years). The neglect complaint averred under R.C. 2151.414 that neither parent substantially remedied the conditions that led to CCDCFS's temporary custody of the children.

CCDCFS obtained temporary custody of Dustin in September 1997, Destiny in December 1997, and Diamond at the point of birth. Glenn came to the attention of CCDCFS when she gave birth to Dustin at age seventeen years old, unmarried, and homeless. Patrick Young, a career criminal and abuser, did not prove to be a suitable parent for placement purposes.

During the permanent custody hearing, the record revealed that over the history of this case, many changes had occurred. The initial case was opened because Glenn, a minor, had no place to go after giving birth to Dustin, May 1995. Glenn's father disapproved of Young and that Dustin was biracial. During CCDCFS's intervention, Glenn found housing and Unicare aided her in getting help with welfare, day care, medical care, and helping her to continue her schooling. In August 1995, CCDCFS closed the case.

CCDCFS reopened it when Shelly sought help in December 1996. She wanted to place Dustin in foster care. Also, an issue arose as to Glenn's physical abuse of Dustin. Apparently, the placement did not occur because on December 16, 1996, a new plan was developed. Shelly moved in the home of Mary Jane Sable, applied for ADC, food stamps, and medical assistance.

On January 17, 1997, Shelly moved from Sable's house and moved back with Young. This necessitated a new plan because of the history of instability and violence perpetrated on Glenn by Young. On October 6, 1997, a new plan was developed because of the birth of Destiny and the emerging temporary custody of Dustin. CCDCFS eventually took temporary custody of Destiny and required Glenn to have parenting classes. Sometime in November 1998, while Glenn was visiting with Destiny, the foster parent reported that diapers were unused and food returned unused after the visits. Apparently, Glenn fed the child cookies.

During these months, Glenn was pregnant but had not revealed it to her caseworker. She also had not received any prenatal care. She did not want anyone to know about the pregnancy. On January 8, 1999, she gave birth to Diamond. CCDCFS immediately placed Diamond with foster parents.

By September 1998, all of the children had been removed from Glenn and Young and were placed in foster care, and adoptable. Glenn and Young had virtually failed in every element of the case plans, *i.e.*, suitable housing, nonviolent home, no contact with Young, requirement that Young seek anger-management counseling, and obtaining employment, attend parenting classes, and complete domestic violence counseling. However, after CCDCFS filed for permanent custody, Glenn did accomplish all of the case plan. CCDCFS filed for permanent custody September 1998, and by November 1998, Glenn had found housing and work at McDonald's.

In November 1998, CCDCFS felt that the housing and job issues were no longer applicable to the case plan. However, under the new case plan, CCDCFS required Glenn not to have further contact with Young.

Glenn completed parenting classes and domestic violence classes. The guardian ad litem ("GAL") concluded that Glenn functions well when Young is in jail. She visits with the children biweekly at Metzenbaum Children's Center and she is receiving counseling.

At the permanent custody hearing, caseworker Tanya Cross testified that she does believe that Glenn will stay away from Young. She further stated, "PC motion is in place and Young had applied children don't have time to wait for the parents to grow up. She had gone over to Patrick Young's house again and gotten herself beaten up again."[1]

The GAL submitted his report on March 24, 1999, and reported that there were no suitable relatives in Young's family for placement of the children and that no relatives in Glenn's family wished to accept placement of the children. Further, the GAL stated:

"* * * Patrick Young has not taken any meaningful steps to curb his anger toward females, and although he has not been known to vent his anger toward his children, he has struck the mother when she was pregnant. Patrick's abusive behavior would not lead to him being a proper custodian of the Glenn children.

"Shelly Glenn appears to be a victim of abuse by Patrick Young, and when he is incarcerated, she is functioning at an acceptable level. She appears to be able to do all that is requested of her for her children's sake. *Without hearing all the*

---

1. "PC" refers to permanent custody.

*testimony, I am not in a position to state, that by clear and convincing evidence, mother should be divested of her parental rights.*" (Emphasis added.)

The GAL also reported that the children's foster parents were willing to adopt. He opined that the foster parents got along well with the children and that their homes were clean, neat, and appropriate. It is unclear from the record whether the GAL, after hearing the evidence, made a recommendation of divestiture.

· During caseworker Tanya Cross's testimony, she explained that although Glenn had made improvements from November 1998 to the time of the hearing, March 1999, before the permanent custody petition, Glenn had been slow to respond to any of the recommendations under the case plan. Cross implied that on Glenn's present record she could work for reunification but was extremely skeptical that Glenn could stay away from Young, and Young showed no evidence of ending his violent behavior. Thus, Cross recommended permanent custody to the county.

Young testified that Glenn had indicated that she wanted to renew their relationship once he was released from prison. Young also admitted to his drug addiction and numerous misdemeanor convictions.

Glenn presented her case and called her mother, Ann Glenn. Ann Glenn stated that her daughter never expressed a desire to continue her relationship with Young. She also testified that she attended visitation of the children with Glenn. She stated that she or Glenn always checked the children's diapers. On cross-examination, she admitted she was aware of the abusive nature of Glenn's relationship with Young. She admitted to seeing bruises on her daughter's body. She admitted telling her daughter repeatedly that she needed to stop seeing Young.

Glenn also testified at the hearing. Glenn said that she was complying with her case plan. Glenn stated that she lived at her current residence since November 1998 after leaving the house she shared with Young. Glenn testified that she attended parenting classes and completed domestic violence counseling. Glenn testified she participates in individual counseling at Marymount Hospital once a week. Glenn also stated that she works at McDonald's where she receives both medical and dental insurance benefits. Glenn stated that she planned to become a manager within a year. Glenn admitted that she visited Young in prison, but stated that she did so because Young threatened to "tell the court a bunch of lies about me to try to take my kids away."

On cross-examination, Glenn admitted that she failed to attend her first parenting class, but added that it was in a bad neighborhood. When asked why she failed to start a domestic violence class until the summer of 1998 although the case plan called for the course in January 1997, Glenn stated, she had to look for a place. Glenn admitted that she spent Labor Day with Young, but denied

Young did anything to hurt her at that time. She stated that the last time Young hurt her was two weeks before she gave birth to her youngest child, Destiny. However, Glenn admitted that Young had beaten her on numerous occasions. Glenn admitted visiting Young several times during his incarceration, but denied having any plans to reunite with Young upon his release from prison. However, Glenn admitted saying that she would never see him again many times in the past, and yet she continued the relationship.

On April 20, 1999, the trial court adjudicated all three children neglected and placed them in the permanent custody of CCDCFS. The trial court made the following findings:

"Upon further consideration, the court finds by clear and convincing evidence that it is in the best interest of the children to grant permanent custody to the Cuyahoga County Department of Children and Family Services and that reasonable efforts by CCDCFS to prevent removal of the children from their home were made and the children are not abandoned or orphaned. The court further finds that the children cannot be placed with their parents within a reasonable time or should not be placed with their parents for the following reasons: parents have failed to remedy the conditions that caused the removal of the children from their home. Mother continues to have a relationship with father even after completing domestic violence program. Mother has failed to establish stable and appropriate housing for the children. Father is presently incarcerated and has not complied with case plan requirements."

Glenn and Young appeal the trial court's judgment.

In her first assignment of error, Shelly Glenn argues that the trial court erred in granting permanent custody of her minor children to CCDCFS because the trial court lacked clear and convincing evidence that Glenn failed to remedy the conditions that prompted the removal of the children from her home. Similarly, Patrick Young, in his sole assignment of error, argues the trial court erred in granting permanent custody to CCDCFS because the weight of the evidence demonstrated that he lacked a meaningful opportunity to comply with the case plan established to aid in regaining custody of his children. Shelly Glenn's first assignment of error and Patrick Young's sole assignment of error have a similar basis in law. Therefore, we consider these assignments simultaneously.

In order to justify termination of parental rights and award permanent custody of a child who is neither abandoned nor orphaned to a public children's services agency, a juvenile court must find by clear and convincing evidence that (1) the grant of permanent custody to the agency is in the best interest of the child and (2) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re Patterson* (1999), 134 Ohio

App.3d 119, 730 N.E.2d 439, citing *In re William S.* (1996), 75 Ohio St.3d 95, 99, 661 N.E.2d 738, 741–742. Clear and convincing evidence is "evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re King* (Aug. 11, 1999), Adams App. No. 99CA671, unreported, 1999 WL 624536, citing *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, 18 OBR 419, 425–426, 481 N.E.2d 613, 620–621; *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. See, also, *Cincinnati Bar Assn. v. Massengale* (1991), 58 Ohio St.3d 121, 122, 568 N.E.2d 1222, 1222–1223.

■ "The standard of review for weight of the evidence issues, even where the burden of proof is 'clear and convincing,' retains its focus upon the existence of 'some competent, credible evidence.'" *Hawn v. Pleasant* (June 1, 1999), Scioto App. No. 98CA2595, unreported, 1999 WL 366584, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60–61. Therefore, when reviewing awards of permanent custody to public children services agencies, judgments supported by some competent, credible evidence must be affirmed. *In re Thomas* (Mar. 9, 2000), Cuyahoga App. Nos. 75330, 75331 and 75332, unreported, 2000 WL 263735; *In re Rowe* (Jan. 30, 1998), Scioto App. No. 97CA2529, unreported, 1998 WL 65460; see, also, *Jones v. Lucas Cty. Children Serv. Bd.* (1988), 46 Ohio App.3d 85, 86, 546 N.E.2d 471, 472–473.

R.C. 2151.414 sets forth the factors a trial court must consider in determining whether a child cannot be placed with his parents. Factors enumerated in R.C. 2151.414 include the following:

"(1) Following the placement of the child outside his home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly for a period of six months or more to substantially remedy the conditions causing the child to be placed outside his home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties;

"* * *

"(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

"* * *

"(6) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing;

"(7) The parent is repeatedly incarcerated and the repeated incarceration prevents the parent from providing care for the child;

"(8) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect." Former R.C. 2151.414(E). See 142 Ohio Laws, Part I, 198, 238, 240.

Once a court determines, by clear and convincing evidence, that one of the enumerated factors exists, the court must enter a finding that the child cannot or should not be placed with either of his parents within a reasonable time. *In re Shanequa H.* (1996), 109 Ohio App.3d 142, 671 N.E.2d 1113; *In re Higby* (1992), 81 Ohio App.3d 466, 611 N.E.2d 403.

A review of the record reveals clear and convincing evidence upon which the trial court could determine that granting permanent custody of the children to CCDCFS is in the best interest of the children and that the children could not and should not be· placed with either parent within a reasonable time. The evidence demonstrated that Glenn and Young maintained a continuing and abusive relationship. Although the violence was not directed at the children, they could be expected to be emotionally and psychologically damaged as a result of the parents' actions. Further, the evidence showed a pattern of behavior suggesting that Glenn planned to continue her relationship with Young upon his release from jail. Additionally, the evidence demonstrated that Glenn failed to address the issues of violence in a timely manner by allowing approximately one and a half years to pass before choosing to participate in a course. The evidence demonstrated that Young exhibited a pattern of violence toward women. The record showed that Young was currently incarcerated and has a history of repeated incarcerations.

If it is shown by clear and convincing evidence that a parent has continuously and repeatedly failed to substantially remedy the conditions that led to the grant of temporary custody of her children to a children services agency, the court must find that the children cannot be placed with the parent within a reasonable time. R.C. 2151.414(E)(1). The evidence presented before the juvenile court clearly and convincingly established that Glenn and Young failed to rectify the conditions that led to the temporary custody order. Under the circumstances, we conclude that the trial court properly decided that the children

could not be placed with either parent within a reasonable time. Accordingly, we overrule Shelly Glenn's first, and Patrick Young's sole, assignments of error.

In her second assignment of error, Shelly Glenn argues that her trial counsel rendered ineffective assistance of counsel by failing to elicit testimony beneficial to Glenn. Glenn argues that the ineffective assistance rendered by her counsel altered the outcome of her case.

The two-part standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, for proving ineffective assistance of counsel in criminal cases also applies in cases where the state attempts to gain involuntary and permanent termination of parental rights. *In re Wise* (1994), 96 Ohio App.3d 619, 627, 645 N.E.2d 812, 816–817; *Jones v. Lucas Cty. Children Serv. Bd.* (1988) 46 Ohio App.3d 85, 546 N.E.2d 471. To prevail on a claim of ineffective assistance of counsel, an appellant must show that her counsel's performance fell below an objective standard of reasonable professional competence and that there is a reasonable probability that, but for the counsel's unprofessional error, the result of the proceeding would have been otherwise. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. However, an appellate court need not address both components of the analysis if one component fails. *In re Hart* (Apr. 16, 1998), Cuyahoga App. No. 71783, unreported, 1998 WL 183863.

In applying *Strickland,* we note that a properly licensed attorney enjoys a presumption of competence. *State v. Nabozny* (1978), 54 Ohio St.2d 195, 214, 8 O.O.3d 181, 191–192, 375 N.E.2d 784, 796–797. Generally, a trial counsel's decision to engage in a particular line of questioning will not be second-guessed on appeal. *State v. Clayton* (1980), 62 Ohio St.2d 45, 16 O.O.3d 35, 402 N.E.2d 1189. Rather, the appellate court will consider trial counsel's decision to be the product of sound trial strategy. *Id.*

In the instant case, Glenn's counsel engaged in the following line of questioning in his direct examination of Glenn:

"Q. Well, okay, I'm using county jail as an institution. You visit [Patrick Young] locked facilities; [*sic*] you not.

"A. Just a couple of times.

"Q. Didn't you visit him at county jail?

"A. Yes.

"Q. Yes?

"A. Yes.

"Q. Did your mom drive you down there?

"A.   Once.

"Q.   Once or a thousand times, it doesn't make any difference.   Did your mom drive you down there?

"A.   Yes.

"Q.   All right.   And your mom.   You heard you [*sic*] mom being asked a question, I believe by Ms. Jones, which, I don't know if it's a good question or a bad question, but it certainly begged an answer your mom didn't have, and that is, don't you wonder why she goes down to see him after he's done all these things to her, and I don't think your mom had an answer;  did she?

"A.   No, she didn't.

"Q.   What is the answer?   Why would you visit this guy who seems to like make a career of beating up—or impregnating first, then beating up girls, and does it for years and years and years.   And we know he's been doing since, at least, 1983?

"A.   I didn't know anything about '83, but, in my regards—

"Q.   You heard Shelly [*sic*] Richmond come in and say she talked to you;  did you not?

"A.   Yes.

"Q.   Was she telling the truth when she said she had conversation with you and said, this guy is trouble?

"A.   I can't recount it, no.

"Q.   Pardon me?

"A.   I can't remember.

"Q.   Was she being truthful when she said it?

"A.   No.

"Q.   She was lying?

"A.   I don't remember any conversation like that.

"Q.   Did you ever ask her if this fine, upstanding man, dressed in orange—

"MR. KOVACIC:  Your Honor, objection.

"Q.   —has paid her a penny in child support?

"Q.   So, tell us, then, why you would, on your own free will, go visit this guy in jail, knowing what a low life, and I use that word loosely, he is?   He beats women, he impregnates minors—

"MR. KOVACIC:  Your Honor (inaudible).

"Q. —he doesn't pay a penny in child support. Why do you visit him? Tell the Judge, why do you visit this guy?

"A. Because of the kids.

"Q. Why do you visit him? Not the children, why would you visit scum like this?

"MR. (UNIDENTIFIED): Your Honor, yeah, this is going a little bit overboard.

"Q. I want an answer to that question. You're losing your children because of him. I want to know why you visit someone like this. Why would you risk your three children over something like this? Look at him, he's in orange? He's in orange for beating up women? Why would you visit him? Answer me?

"A. I don't know.

"Q. Answer me.

"A. Because he was telling me he would tell the Court a bunch of lies about me to try to take my kids away from me.

"Q. Well, he did a good job didn't he?"

██  Glenn argues that her counsel's performance created a picture of a mother who sought out domestic violence and lacked commitment to her children. Glenn argues, but for her counsel's deficient performance, that it is possible the trial court would not have granted CCDCFS permanent custody of her children. Further, Glenn suggests that her counsel's performance was so deficient as to be *per se* prejudicial. She cites *Rickman v. Bell* (C.A.6, 1997), 131 F.3d 1150, in support of this proposition.

In *Rickman,* defense counsel conducted no investigation and presented no defense during the guilt phase of death penalty proceedings. Moreover, during the guilt phase of the trial, defense counsel pursued a strategy designed to show that his client was a sick and subnormal human being, although he had been found competent to stand trial. *Rickman,* at 1157. He suggested in his questioning of witnesses that Rickman looked like he had just been released from an insane asylum and in his closing argument, he argued that Rickman was as wild as a March hare. *Id.* at 1158–1159. In addition, defense counsel elicited testimony during cross-examination of co-defendants that the murder had been thoroughly planned in advance, despite proof that suggested Rickman entered the victim's residence without a lethal weapon and may have lacked a coherent plan as to how she was to be killed. *Id.* at 1158. Finally, defense counsel even called a witness to testify as to Rickman's threats to commit unrelated crimes. *Id.* Given these facts, the Rickman court concluded that "[defense counsel's] perfor-

mance dispenses with the necessity of a separate showing of prejudice [as required by *Strickland*]; it is, in this case, patently inherent." *Id.*

CCDCFS argues that, in contrast to the defense counsel in *Rickman,* Glenn's counsel demonstrated a thorough grasp of the facts of the case. He vigorously cross-examined witnesses presented by CCDCFS. For example, he challenged Donna Miller's truthfulness by suggesting that Miller testified against Glenn because Glenn owed her money. During cross-examination of Patrick Nicolino, Glenn's domestic violence counselor, trial counsel attempted to establish that Glenn's continuing relationship with Patrick Young was not unusual and did not necessarily need to be terminated. He also challenged the program's method of evaluating a client's degree of success in the program, as well as the program's overall success rate. Further, Glenn concedes that her trial counsel's examination of other witnesses elicited beneficial facts and testimony.

While we may not agree with trial counsel regarding the line of questioning followed with Glenn, we cannot conclude on this record that his representation is below an objective standard of reasonable professional competence. Accordingly, we overrule Glenn's second assignment of error.

*Judgment affirmed.*

JAMES D. SWEENEY, P.J., and PORTER, J., concur.