[Cite as *In re J.J.*, 2019-Ohio-4984.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|                          |   |            |
|--------------------------|---|------------|
| IN RE J.J.               | : |            |
| Minor Child              | : | No. 108564 |
| [Appeal by E.A., Mother] | : |            |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 5, 2019

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Court Division
Case No. AD18905474

---

### *Appearances:*

Kelly Zacharias, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Andrea J. Latessa and Cheryl Rice, Assistant Prosecuting Attorneys, *for appellee.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Appellant mother E.A. ("Mother") appeals from the judgment of the juvenile court awarding permanent custody of her minor son, J.J., to the Cuyahoga County Department of Children and Family Services ("CCDCFS" or "agency"). Upon a thorough review of the record, we find that the juvenile court properly engaged in

the two-prong analysis prescribed by R.C. 2151.414 and clear and convincing evidence supports the court's decision granting permanent custody of the child to the agency. We therefore affirm.

I. Procedural History and Substantive Facts

{¶ 2} J.J. was born on April 25, 2018, and two days later, CCDCFS filed a complaint for dependency and permanent custody alleging Mother has mental health challenges, specifically depressive disorder, that prevent her from providing appropriate care for the child; she has five other children who were removed from her care and custody; she has a history of substance abuse issues that prevent her from providing appropriate care for the child; and Mother has continued to maintain a relationship with the child's father, Jo.J. ("Father"), despite being the victim of domestic violence at his hands. The agency also filed a motion for pre-dispositional temporary custody of the child, which the trial court granted.

{¶ 3} On September 6, 2018, the court held a hearing on adjudication, during which Mother stipulated to an amended complaint that included the following allegations: Mother has depressive disorder and was dismissed from treatment in November 2016 due to noncompliance; Mother has a history of substance abuse dependency and has not complied with the case plan requirement to submit to random drug tests; Mother has maintained a relationship with the child's father despite being the victim of domestic violence; and she has five other children who had been adjudicated dependent and were removed from her care.

{¶ 4} During the adjudication hearing, the assigned social worker, Tracy Simpkins ("Simpkins"), testified that domestic violence has continued to be an issue for Mother. According to Simpkins, Mother had completed domestic violence class in the past but she has not benefitted because she immediately returned to a relationship with her abuser, J.J.'s father, as well as another individual who also engaged in domestic violence. Simpkins further testified that Mother was kicked out of a domestic violence shelter because she violated the rules of the shelter. Simpkins stated that Mother was therefore homeless, staying with a "sponsor" outside of the county. Finally, Simpkins noted that Mother had engaged in mental health services, but because she moved to Ravenna and gave up her CMHA housing, she must begin mental health services over again in Ravenna.

{¶ 5} Regarding Father, Simpkins testified that he had been convicted of domestic violence against Mother and was incarcerated for 16 months of the imposed three-year sentence. Simpkins stated that "[w]hen [Father] got out in August 2017, Mother moved in a place in September and they [were] right back together."

{¶ 6} On September 12, 2018, the court found that allegations of the amended complaint were proven by clear and convincing evidence and further found that the child lacked adequate parental care because of the mental health of the child's parents because "Mother is currently homeless and the parents are not engaged in services designed for reunification," the child's return to Mother will be contrary to the child's best interest, and suitable relatives cannot be located. The

court also found that the agency had made reasonable efforts to prevent the continued removal of the child from the home.

{¶ 7} The court ordered Mother to submit to a chemical abuse assessment; to treatment, if recommended; and if treatment is recommended, to alcohol and/or drug testing before, during, and after chemical abuse treatment. The court then adjudicated the child dependent.

{¶ 8} On April 4, 2019, the court held a dispositional hearing, during which the court heard testimony from the social worker in this case.

## II. Dispositional Hearing

{¶ 9} The ongoing social worker, Simpkins, testified on behalf of the agency. Mother's history with the agency began in 2013, and Simpkins received the case "three years ago." J.J. was removed from Mother's care and custody directly from the hospital in April 2018, when J.J. was two days old. At the time of the dispositional hearing, J.J. was 11 months old.

{¶ 10} The record shows that Mother has five other children, all of whom have been removed from Mother's care and custody and are in the permanent custody of the agency. J.J.'s father, Jo.J., is also the father of one of the other children in the agency's custody. The agency's concerns with Mother beginning in 2013 were substance abuse, mental health, housing, and domestic violence. At that time, the agency also had concerns regarding Father's paternity, housing, domestic violence, and interrelationship with his child. To address those concerns, the agency developed a case plan. Both parents failed to comply with the case plan.

{¶ 11} Simpkins stated that the agency's initial concerns with Mother regarding mental health issues, substance abuse, housing, and domestic violence, and the agency's concerns with Father regarding domestic violence, housing, and interrelationship with the child, have continued to date. Regarding the current case, the agency developed a case plan for both Mother and Father. According to Simpkins, she reviewed the case plan with the parents and neither parent expressed objections to the case plan. Mother in fact signed the case plan. Father did not sign the case plan "because he never made himself available; [rather h]e would just call and cuss me out."

{¶ 12} Simpkins testified that Mother completed a domestic violence class. She failed to benefit from the services, however, because she continued a relationship with J.J.'s father, who had been convicted of domestic violence against her.

{¶ 13} Simpkins testified that Mother did not have housing at the beginning of J.J.'s case, but she later obtained housing through CMHA. Mother left her CMHA housing, however, to return to Father. At the time of the hearing, Mother had no stable housing and relied on friends and her advocate for a place to stay. When Simpkins requested to visit Mother at her friends' place, Mother informed her that these friends also had an open case with the agency and did not want Simpkins coming to their home.

{¶ 14} Regarding her employment, the social worker testified that Mother reported that she is working "under the table." Simpkins, however, has not been able to verify this employment.

{¶ 15} Additionally, Mother failed to complete mental health and substance abuse services. According to Simpkins, Mother went to The Centers for mental health services "one or two times." She also went to Catholic Charities for substance abuse services only "one or two times." Simpkins stated that Mother went to St. Coleman's as well. This program provided dual-diagnostic assessment. Mother completed the assessment, and St. Coleman's recommended both mental health and substance abuse services. Mother failed to engage in the recommended services, however, meeting only with the case manager on three occasions. And Mother repeatedly refused to submit to drug tests. When she finally agreed in February 2019, Mother tested positive for cocaine. According to Simpkins, Mother admitted to having relapsed.

{¶ 16} Simpkins testified concerning Mother's visitation with J.J., stating that Mother visits regularly and she "loves her baby." Simpkins also stated that Mother is good with J.J. during the visits, explaining that Mother plays with him, talks to him, and hugs and kisses him.

{¶ 17} Regarding Father, Simpkins testified that Father failed to make himself available for case plan services, and he repeatedly failed to attend court hearings. When Father interacted with Simpkins, he "would cuss [her] out," argue with her, and threatened to kill her. At this point, visitation with the baby and

Mother was moved to a different location because the agency was concerned for the safety of the social worker and the transporter, who was afraid to transport the baby for fear of Father showing up. Simpkins further stated that Mother's visitations became supervised because of Father's demonstrated aggression toward the social worker, explaining that at the first visitation without the social worker, the baby's transporter was afraid to remove the baby from the vehicle because she heard Mother talking to Father.

{¶ 18} Simpkins added to Father's case plan that he build a relationship with J.J. because he was "slow to visit the baby." On most occasions when Simpkins called Father for visitation, he would "cuss [her] out" and threaten her. On one occasion, Father agreed to visit, but he was a "no-show." Father has failed to visit J.J. in the 11 months since J.J. was placed in the agency's custody.

{¶ 19} Simpkins stated that Father once faxed her a purported paycheck stub, but she was unable to confirm his employment because the document lacked an identifiable employer or contact number. The document contained only "numbers, letters" and did not include a letterhead. Father also sent a purported certificate from a fatherhood class. Once again, however, Simpkins was unable to confirm Father's attendance because the documents lacked an entity name, phone number, and contact information. At the time of the dispositional hearing, Father was living at a men's shelter.

{¶ 20} Simpkins testified that the agency investigated relatives for possible placement of J.J. but found no willing and able family members. Mother's mother

is older and working with her husband as a truck driver, so she is not able to care for the child. Mother's sister never returned the social worker's phone call. And Father's mother "wasn't going to be bothered."

{¶ 21} Simpkins testified that J.J. is a healthy, happy baby. He presently lives with his foster parents with whom he was originally placed at birth. Simpkins has observed the child in his current placement and described J.J.'s relationship with his foster parents:

> They love him. He loves them. They don't have their own children. He's a happy baby. He's bonded with them. He has a big * * * play area. Foster mom sends a little book [for Mother to read] that [tells Mother] about [J.J's] development and what's going on. So it's really nice.

{¶ 22} Finally, Simpkins testified that the current plan is reunification, but the parents have not substantially benefitted from any of the services offered, nor have they remedied any conditions that caused the initial removal of the child from the parents' care:

> Having had this case for three years, it's been the same or similar each year, and [with] domestic violence, mental health, housing with both parents, and they have not benefitted.

> Each year we close up one case and mom's expecting with another baby, and it just keeps going over and over again non-stop.

{¶ 23} Simpkins does not believe Mother and Father can provide a safe and stable permanent home in which J.J. can thrive, because the parents "never address the issues," Father has a current warrant out for theft, and the parents do not have housing. According to Simpkins, J.J. needs a legally secure placement, a "forever

family" is in J.J.'s best interest, and this could occur if permanent custody is granted to the agency so that J.J. could be eligible for adoption.

{¶ 24} At the close of the dispositional hearing, the trial court noted that it received the guardian ad litem's (GAL) report. At the hearing, the GAL recommended permanent custody to the agency, explaining that contrary to Mother's promises, Mother has failed to secure stable housing "in order to organize the rest of her life." The GAL stated that since Mother lost her initial housing, "she's been in a downward spiral." Therefore, his recommendation remained unchanged.

## III. Assignment of Error

{¶ 25} Following the dispositional hearing, the juvenile court concluded that clear and convincing evidence supported the agency's motion for permanent custody.

{¶ 26} Mother appealed, raising one assignment of error:

> The juvenile court committed error to the prejudice of the appellant contrary to the manifest weight and sufficiency of the evidence in determining a grant of permanent custody to CCDCFS to be in the best interest of [the child].

## IV. Standard of Review

{¶ 27} We recognize that "a parent's right to raise a child is an essential and basic civil right." *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). And the permanent termination of parental rights has been described as "the family law equivalent of the death penalty in a criminal case." *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14.

**{¶ 28}** A parent's right, however, is subject to the ultimate welfare of the child, "'which is the polestar or controlling principle to be observed.'" *In re L.D.*, 8th Dist. Cuyahoga No. 104325, 2017-Ohio-1037, ¶ 29, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). "All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation." *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996).

**{¶ 29}** Under R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that (1) one of the factors enumerated in R.C. 2151.414(B)(1)(a)-(d) applies, and (2) an award of permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "'a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613,(1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. While requiring a greater standard of proof than a preponderance of the evidence, clear and convincing evidence requires less than proof beyond a reasonable doubt. *In re Awkal*, 95 Ohio App.3d 309, 642 N.E.2d 424 (8th Dist.1994).

**{¶ 30}** We will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency unless the judgment is not supported by clear and convincing evidence. *See, e.g., In re N.B.*, 8th Dist. Cuyahoga

No. 101390, 2015-Ohio-314, ¶ 48; and *In re M.J.*, 8th Dist. Cuyahoga No. 100071, 2013-Ohio-5440, ¶ 24.

V. Permanent Custody Analysis:  The Two-Prong Test

**{¶ 31}** As previously stated, R.C. 2151.414 sets forth a two-part analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. R.C. 2151.414(B).  Under this statute, the juvenile court is authorized to grant permanent custody of a child to the agency if, after a hearing, the court determines, by clear and convincing evidence, that (1) any of the five factors under R.C. 2151.414(B)(1)(a) to (e) exist, and (2) permanent custody is in the best interest of the child under the factors enumerated in R.C. 2151.414(D).  The first prong focuses on the parent while the second prong focuses on the child.

A.  R.C. 2151.414(B)(1) Factors

**{¶ 32}** Under the first prong, the trial court is authorized to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of these five factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) whether the child or a sibling has been adjudicated as abused, neglected, or dependent on three occasions.

R.C. 2151.414(B)(1)(a)-(e). Only one of the five factors must be present for this first prong of the permanent custody analysis to be satisfied. *In re L.W.*, 8th Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 28.

{¶ 33} In determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent, pursuant to R.C. 2151.414(B)(1)(a), the trial court must consider the enumerated reunification factors, including:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

> (2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

> * * *

> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

> * * *

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child * * *, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

* * *

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

* * *

(16) Any other factor the court considers relevant.

R.C. 2151.414(E).

{¶ 34} Only one of the reunification factors is required to exist for the court to find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re Glenn*, 139 Ohio App.3d 105, 113, 742 N.E.2d 1210 (8th Dist.2000). Indeed, once the court has properly determined that one of the enumerated factors exists, the court must enter a finding that the child cannot or should not be placed with either of his parents within a reasonable period of time. *In re Hauserman*, 8th Dist. Cuyahoga No. 75831, 2000 Ohio App. LEXIS 338, 12 (Feb. 3, 2000).

{¶ 35} Here, under the first prong of the permanent-custody analysis, the trial court found that the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents under

R.C. 2151.414(B)(1)(a).   In support, the court properly considered the factors outlined in R.C. 2151.414(E).

{¶ 36} Although the trial court need only make one finding to support its determination that J.J. cannot be placed with Mother within a reasonable time or should not be placed with Mother, the court found five factors present: R.C. 2151.414(E)(1), (2), (4), (11), and (14).

{¶ 37} In support, the court stated as follows:

> The court further finds that following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home; the parents have not sustained housing for themselves; father has not engaged in services designed for reunification; mother has not benefitted from ongoing services, including domestic violence, and anger management for father, designed to prevent the removal of [the child].

> The mother has a chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency [that] is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated within one year.  The parents have demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 38} The court also found that the parents have had parental rights terminated with respect to a sibling of the child and "the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for

the health, welfare, and safety of the child." The court then additionally found that the parent is unwilling or unable to provide food, clothing, shelter, and other basic necessities for the child.

{¶ 39} Our review of the record indicates that there is clear and convincing evidence that J.J. cannot be placed with either parent within a reasonable time or should not be placed with the child's parents. In its efforts to facilitate reunification, the agency developed a case plan to address its concerns with Mother's depressive disorder, substance abuse, housing needs, and domestic violence, as well as Father's housing, domestic violence, and interrelationship with J.J. The social worker testified that neither Mother nor Father have benefitted from any of the services offered and they have repeatedly failed to remedy the conditions that caused J.J.'s removal. *See In re McKenzie*, 9th Dist. Wayne No. 95CA0015, 1995 Ohio App. LEXIS 4618, 11 (Oct. 18, 1995) (stating that the issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal).

{¶ 40} The record shows that Mother's parental rights have been involuntarily terminated regarding all of her five previous children, one of whom Jo.J. is the father. Mother completed a domestic violence class but failed to benefit from the services because she continued her relationship with J.J.'s father, her abuser. Although Mother attended The Centers and Catholic Charities for substance abuse and mental health services, she never completed the services, having attended only "one or two times." Mother also met with a case manager at St. Coleman's;

however, she never received substance abuse or mental health services there. And Mother failed the only drug screen to which she submitted, testing positive for cocaine in February 2019. Mother's depressive disorder and her substance abuse have been an agency concern since 2013. The fact that these concerns continue through today demonstrate the chronic nature of Mother's mental or emotional illness and/or her chemical dependency.

{¶ 41} Finally, Mother has failed to maintain a basic necessity for the child — housing. She initially secured housing with CMHA, but she left that home to be with Father, and she is presently staying with friends who will not allow visits from the social worker. Although Mother regularly visits J.J. and is "good" with J.J. during the visits, these visits do not replace the need for a safe and stable permanent home.

{¶ 42} The record also shows that Father has never visited with J.J. in the 11 months he has been in the agency's custody. Father has failed to secure stable housing and is presently staying in a men's shelter. Although Father has submitted purported paycheck stubs, the social worker has not been able to verify actual employment because the paycheck stubs do not contain any employer name or contact information. The record also reflects that Father demonstrated aggressive behavior toward the social worker, "cuss[ing] her out" and threatening her, and he frightened the baby's transporter and other agency personnel.

{¶ 43} In light of the foregoing, we find that clear and convincing evidence supports the trial court's finding that J.J. cannot be placed with Mother within a

reasonable time or should not be placed with her.  The first prong of the permanent custody analysis is therefore satisfied.

## B. Best Interest of the Child

{¶ 44} Once the trial court determines that any of the five factors under R.C. 2151.414(B)(1) exists, the court proceeds to analyze the second prong — whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency. R.C. 2151.414(D).

{¶ 45} In determining the best interest of the child, R.C. 2151.414(D)(1) mandates that the juvenile court consider all relevant factors, including the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 46} When analyzing the best interest of the child, "[t]here is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Also, only one of these enumerated factors needs to be resolved in favor of the award of permanent custody. *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30, citing *In re Moore*, 8th Dist. Cuyahoga No. 76942, 2000 Ohio App. LEXIS 3958 (Aug. 31, 2000).

{¶ 47} Here, the court found that the child's return to Mother's home is contrary to the child's best interest. In support of its finding, the court noted that it considered the best-interest factors delineated in R.C. 2151.414(D), including the interaction and interrelationship of the child with the child's parents, siblings, foster parents; the custodial history of the child; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and the GAL's report.

{¶ 48} The record shows that J.J. has been in the agency's custody since birth and he has never lived with Mother. Although Mother has successfully interacted with J.J. during regular visits, the record demonstrates that Mother has been unable or unwilling to provide a safe and secure permanent home to which J.J. is entitled.

> [N]eglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term, are not required to "languish" in legally insecure placements for years while natural parents are unwilling or unable to correct serious parenting deficiencies, and their best interest is the pivotal factor in permanency case.

*In re T.S.*, 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, ¶ 35, citing *In re Mayle*, 8th Dist. Nos. 76739 and 77165, 2000 Ohio App. LEXIS 3379 (July 27, 2000). Moreover, Father has had no interaction at all with J.J., nor has he secured a safe and stable permanent home. Rather, Father has never complied with the agency's case plan and he stays in a men's shelter.

{¶ 49} The record also shows that J.J. needs a secure and permanent home. The social worker testified that a "forever family" is in J.J.'s best interest. And the GAL testified that permanent custody to the agency is in J.J.'s best interest, explaining that Mother has repeatedly failed to secure stable housing and has been in "a downward spiral" since leaving her CMHA home. Additionally, in considering J.J.'s relationship with others, the record reflects that J.J. is presently a healthy and happy baby and he has bonded with his foster parents with whom he had been placed since birth.

{¶ 50} Finally, the agency presented evidence that Mother had five other children who were placed in the permanent custody of the agency, one of whom is also Father's child. As the social worker testified, nothing has changed with either parent, stating, "Having had this case for three years, it's been the same or similar each year — domestic violence, mental health, housing with both parents — and they have not benefitted." And Mother has failed to present any evidence to demonstrate that, notwithstanding the prior involuntary termination of her other children, she is now able to provide "a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." *In re J.T.*, 8th Dist. Cuyahoga Nos.

93240, 93241, 2009-Ohio-6224, ¶ 56 (noting the parent's burden under R.C. 2151.414(E)(11) in a best interest determination); *In re E.A.,* 9th Dist. Medina No. 12CA0059-M, 2012-Ohio-5925, ¶ 14 (finding the mother failed to rebut the presumption that, "because her parental rights were involuntarily terminated as to her other children, she is not a suitable parent for additional children").

{¶ 51} In light of the foregoing, we find clear and convincing evidence in the record supporting the trial court's determination that permanent custody to the agency is in J.J.'s best interest.

{¶ 52} Accordingly, upon our review, we find that the juvenile court properly engaged in the two-prong analysis prescribed by R.C. 2151.414 and clear and convincing evidence supports the court's decision granting permanent custody of the child to the agency.

{¶ 53} Mother's sole assignment of error is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, JUDGE

MARY J. BOYLE, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR